Margaret J. MARTIN, Appellant,

v.

UNITED WAY OF ERIE COUNTY.

No. 86–3756.

United States Court of Appeals,
Third Circuit.

Submitted Under Third Circuit Rule 12(6)
May 18, 1987.

Decided Sept. 23, 1987.

Richard T. Ruth, Erie, Pa., for appellant.

Richard W. Perhacs, Elderkin, Martin, Kelly, Messina & Zamboldi, Erie, Pa., for appellee.

Before SLOVITER, BECKER and GARTH, Circuit Judges.

## OPINION OF THE COURT

SLOVITER, Circuit Judge.

In her amended complaint, appellant Margaret J. Martin alleges that her employer United Way of Erie County (United Way) discriminated against her on the basis of her age and her sex in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621–634 (1985), and Title VII of the 1964 Civil Rights Act, as amended, 42 U.S.C. § 2000e to 2000e–17 (1981). The district court granted summary judgment to United Way on the ADEA and Title VII claims on the ground that United Way was not engaged in an "industry affecting commerce" and on the ADEA claim on the additional ground that United Way was not an "employer" under the ADEA because it did not employ twenty or more employees for twenty or more weeks during the relevant years. Because we conclude that there exist genuine issues of material fact as to both grounds for the district court's grant of summary judgment, we reverse and remand for further proceedings.

## I.

### FACTS

Margaret J. Martin was employed part-time by United Way of Erie County, a non-profit corporation incorporated under the laws of Pennsylvania, from June 1981 through April 19, 1985. From May 1982 through April 19, 1985, Martin worked three-quarter time as an Assistant Communications Director for United Way. Martin was born February 2, 1935, and at all times material to the present litigation was between 40 and 70 years of age. Her performance at United Way was admittedly adequate. On April 19, 1985, Martin resigned from United Way.

Martin alleges that in early January 1985 she learned that the position of Communications Director would be open; United Way advertised the opening in local papers and Martin submitted an application for the position on January 31, 1985. Martin was never given an interview for the position, but on February 13, 1985 she was called into the office of A. Gene Beer, United Way's Executive Director, who told her that the advertised position would not be filled due to a reorganization of United Way, and that in any event she did not fit the young and pretty image required for the position she sought. Beer stated that two new individuals would be hired for the Campaign and Communications Department, Stephen Babbitt as Campaign/Communications Executive Director for a period of one year only, and James Martin as Campaign and Communications Director with responsibilities equivalent to the Communications Director position Margaret Martin had originally sought. James Martin was younger than Margaret Martin and Margaret Martin alleges that both James Martin and Stephen Babbitt had inferior qualifications to hers. Beer later told Margaret Martin that no full-time work would be available to her, and, based upon this representation, Martin resigned from United Way. One week after Martin resigned, a young, slim woman was hired full-time for the position of Communicator. Martin also alleges that United Way discriminated against women in wages, hiring and promotion.

United Way moved to dismiss for lack of subject matter jurisdiction as well as failure to state a claim on the grounds, *inter alia*, that United Way was not engaged in an "industry affecting commerce" under the ADEA, 29 U.S.C. § 630(h), or under Title VII, 42 U.S.C. § 2000e(h), and that United Way was not an "employer" because it did not employ twenty employees for twenty weeks during the relevant years as required by the ADEA, 29 U.S.C. § 630(b). The district court conducted an evidentiary hearing at which evidence was presented on the questions of whether United Way was engaged in an "industry affecting commerce" and whether United Way had the requisite number of employees. Thereafter, United Way, at the district court's direction, filed a motion for summary judgment.

The district court, in granting United Way's motion for summary judgment, took judicial notice of the fact that "there are literally hundreds of organizations such as defendant operating throughout the United States as charitable organizations soliciting funds for charity and disbursing funds but with no industry or profit motive involved." App. at 285–86. The district court concluded that "trade in commerce as generally understood is controlling" but that "non-tax-paying, non-profit charitable corporations with but a single situs such as defendant were not embraced in these two statutes." App. at 286. As an additional ground for granting summary judgment to United Way on the ADEA count, the district court concluded that United Way did not employ the requisite number of employees. Martin appeals.

## II.

## PROCEDURE

In an analogous situation, we cautioned the district court about pretermitting a ruling on the merits by an adverse ruling on jurisdiction that was intertwined with the merits. In *Kulick v. Pocono Downs Racing Ass'n, Inc.*, 816 F.2d 895 (3d Cir.1987), we held that the issue of whether state action existed to support a civil rights claim under 42 U.S.C. § 1983 was a matter to be resolved on the merits rather than as a matter of subject matter jurisdiction to be resolved under Fed.R.Civ.P. 12(b)(1). We stated that "[e]lements of a claim that are called jurisdictional because they relate to Congress's jurisdiction remain questions of the merits, and the Supreme Court has made clear that a court may resolve them only in the manner that the court may resolve all other questions of the merits." *Id.* at 898.

As we pointed out in *Kulick*,

the Supreme Court has permitted courts to dismiss a claim for lack of jurisdiction if the federal claim is "made solely for the purpose of obtaining jurisdiction" or if the claim is "wholly insubstantial and frivolous." *Bell v. Hood*, 327 U.S. [678] at 682–83, 66 S.Ct. [773] at 776, [90 L.Ed. 939 (1946)]. These exceptions do not permit a court to prejudge the facts alleged in the complaint, however, for a court may dismiss for lack of jurisdiction only if claims are "insubstantial on their face." *Hagans v. Lavine*, 415 U.S. 528, 542 n. 10, 94 S.Ct. 1372, 1382 n. 10, 39 L.Ed.2d 577 (1974) (*quoting Brotherhood of Locomotive Eng'rs v. Chicago, Rock Island & Pac. R.R. Co.*, 382 U.S. 423, 428, 86 S.Ct. 594, 596, 15 L.Ed.2d 501 (1966)).

*Id.* at 898–99.

Martin's claims in this case are not so insubstantial and frivolous that we can say they were made solely for the purpose of obtaining jurisdiction. Thus, unless the district court could properly find that no genuine issue of material fact existed with respect to the allegations that the activities of United Way "affected commerce" or that it was an "employer", the district court was obliged to deny summary judgment and to proceed to have the factfinder determine the merits of the controversy. It has, of course, been established that ADEA plaintiffs are entitled to a jury trial. *See Lorillard v. Pons*, 434 U.S. 575, 585, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978).

## III.

## INDUSTRY AFFECTING COMMERCE

Although the district court's opinion is not pellucid, the court appears to have concluded that, as a matter of law, the term "industry affecting commerce" under the ADEA and Title VII excludes charitable, non-profit corporations. We consider that issue first. If the district court erred, we must then consider whether United Way's ties to interstate commerce are so tenuous that the court could properly conclude that there is no genuine issue of material fact as to United Way's coverage under Title VII and the ADEA.

## A.

Under both Title VII and the ADEA, an "employer" must be "a person engaged in an industry affecting commerce." *See* 42 U.S.C. § 2000e(b) (Title VII), 29 U.S.C.

§ 630(b) (ADEA). Under Title VII, "industry affecting commerce" is defined as:

> any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959, and further includes any governmental industry, business, or activity.

42 U.S.C. § 2000e(h). There is a similar definition under the ADEA.[1]

The House Judiciary Committee Report on the Civil Rights Act of 1964 stated that the term "industry affecting commerce" was to be defined "in the manner common for Federal statutes." H.R.Rep. No. 914, 88th Cong., 1st Sess., *reprinted in* 1964 U.S.Code Cong. & Admin.News 2355, 2402. Congress was aware of the traditional interpretation given by the courts to the term "affecting commerce." *See* 110 Cong.Rec. 7212 (1964) (interpretive Senate memorandum); *id.* at 1528 (statement of Mr. Celler).

Thus, when Congress expressly incorporated into Title VII and the ADEA[2] the definition of "affecting commerce" from the labor laws,[3] the term "affecting commerce" had been interpreted as vesting in the National Labor Relations Board "the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963). Moreover, in *Polish*

*National Alliance v. NLRB*, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944), the Court made clear that the term "affecting commerce" was to be interpreted generally as providing for the exercise of Congress' power to the full extent granted under the Commerce Clause. The Court stated that, "when [Congress] wants to bring aspects of commerce within the full sweep of its constitutional authority, it manifests its purpose by regulating not only 'commerce' but also matters which 'affect', 'interrupt', or 'promote' interstate commerce." *Id.* at 647, 64 S.Ct. at 1198 (citations to statutes omitted).

Although the term "industry affecting commerce" may suggest a limitation to commercial enterprises, it is clear that Congress intended to cover all activities affecting commerce, to the extent permitted by the Constitution, regardless of whether they are operated for non-profit or charitable purposes. Thus, for example, we have assumed without discussion that a non-profit organization engaged in placing American teachers in foreign schools was subject to Title VII as an "employer" engaged in an "industry affecting commerce," as those terms are defined in the Act. *See Bryant v. International School Services, Inc.*, 675 F.2d 562 (3d Cir.1982); *see also EEOC v. First Catholic Slovak Ladies Ass'n*, 694 F.2d 1068 (6th Cir.1982) (benevolent, charitable, non-profit organization deemed, without discussion, to be subject to ADEA), *cert. denied*, 464 U.S. 819, 104 S.Ct. 80, 78 L.Ed.2d 90 (1983); *Sibley*

---

1. Under the ADEA, "industry affecting commerce" is defined as:

   any activity, business, or industry in commerce or in which a labor dispute would hinder or obstruct commerce or the free flow of commerce and includes any activity or industry "affecting commerce" within the meaning of the Labor-Management Reporting and Disclosure Act of 1959.

   29 U.S.C. § 630(h).

2. In *EEOC v. Zippo Mfg. Co.*, 713 F.2d 32, 38 (3d Cir.1983), we noted that "the substantive 'prohibitions of the ADEA were derived *in haec verba* from Title VII,'" (quoting *Lorillard v. Pons*, 434 U.S. 575, 584, 98 S.Ct. 866, 872, 55 L.Ed.2d 40 (1978)), and thus "the scope of its substantive prohibition of discrimination in employment is determined by Title VII." In that case, we held

   that Title VII prescribed the standard for determining employee status under the ADEA. In light of the similarity in the definitions of "industry affecting commerce" under Title VII and the ADEA, we likewise turn to Title VII for the interpretation of this term.

3. The definition of the term "affecting commerce" is substantially the same under the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 402(c) (1985), the Labor Management Relations Act, 29 U.S.C. § 142(1) (1973), and the National Labor Relations Act, 29 U.S.C. § 152(7) (1973). Courts have treated all three labor acts interchangeably for this purpose. *See, e.g., Usery v. Manchester East Catholic Regional School Board*, 430 F.Supp. 188, 190 (D.N. H.1977).

*Memorial Hospital v. Wilson,* 488 F.2d 1338 (D.C.Cir.1973) (non-profit hospital subject to Title VII). Several district courts have likewise held that non-profit organizations were "industries affecting commerce" under Title VII. *See Calcote v. Texas Educational Foundation,* 458 F.Supp. 231 (W.D.Tex.1976); *EEOC v. National Academy of Sciences,* 12 E.P.D. ¶ 11,010 (D.D.C. 1976).

In certain limited situations, such as when dealing with religious organizations and sectarian schools, Congress provided exemptions from the provisions of Title VII prohibiting discrimination based on religion. *See* 42 U.S.C. § 2000e–1; 42 U.S.C. § 2000e–2(e)(2). Congress' enactment of such exemptions constitutes implicit recognition that such organizations are not *ipso facto* precluded from Title VII under the "industry affecting commerce" definition. As the court stated in *McClure v. Salvation Army,* 460 F.2d 553, 557 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972), "[t]he effect of these provisions is to cause a religious organization qualifying as such to be considered as an 'employer', and to eliminate only certain of their employment relations from the prohibitions of Title VII." Moreover, the legislative history of the sectarian school exemption makes clear that it was proposed because the author of the amendment had no doubt that "these church-related schools come under this bill as 'affecting commerce.'" 110 Cong.Rec. 2585 (1964).

Congress enacted Title VII and the ADEA for the ameliorative purpose of eradicating prohibited forms of discrimination from the workplace. "Organizations affecting commerce may not escape the coverage of social legislation by showing that they were created for fraternal or religious purposes." *McClure,* 460 F.2d at 557. *See also Rayburn v. General Conference of Seventh-Day Adventists,* 772 F.2d 1164, 1166–67 (4th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 3333, 92 L.Ed.2d 739 (1986); *EEOC v. Pacific Press Publishing Ass'n,* 676 F.2d 1272, 1276–77 (9th Cir.1982); *EEOC v. Mississippi College,* 626 F.2d 477, 484 (5th Cir.1980), *cert. denied,* 453 U.S. 912, 101 S.Ct. 3143, 69 L.Ed.2d 994 (1981). It follows that to the extent that the district court believed that Title VII and the ADEA do not cover "non-tax-paying, non-profitable charitable corporations," App. at 286, the court erred as a matter of law.

### B.

United Way argues that even if it is not exempted from the operation of Title VII and the ADEA by its non-profit and charitable purposes, its actual connections to interstate commerce are so minimal as to exclude it as a matter of law from the reach of the antidiscrimination laws.

In discussing the reach of the Commerce Clause power granted to Congress, the Supreme Court has stated:

> This grant ... "extends to those activities intrastate which so affect interstate commerce, or the exertion of the power of Congress over it, as to make regulation of them appropriate means to the attainment of a legitimate end, the effective execution of the granted power to regulate interstate commerce." *United States v. Wrightwood Dairy Co.,* 315 U.S. 110, 119, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942).

*Katzenbach v. McClung,* 379 U.S. 294, 302, 85 S.Ct. 377, 382, 13 L.Ed.2d 290 (1964). Using this analysis, the Court held that the operation of a restaurant that received approximately $70,000 worth of food that had moved in commerce "affected commerce", and thus subjected the restaurant to Title II of the Civil Rights Act of 1964 prohibiting discrimination in places of public accommodation. The Court explained,

> [m]uch is said about a restaurant business being local but "even if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce...." *Wickard v. Filburn,* 317 U.S. 111, 125, 63 S.Ct. 82, 89, 87 L.Ed. 122 (1942).

*Id.*

Similarly, in *Daniel v. Paul,* 395 U.S. 298, 305, 89 S.Ct. 1697, 1701, 23 L.Ed.2d

318 (1969), the Court held that because a "substantial portion of the food" served at a snack bar located at an amusement park had moved in interstate commerce, the entire facility was subject to Title II. Alternatively, the Court held that the entire facility was a place of entertainment "affecting commerce" because the facility leased its paddle boats from an out-of-state source, had purchased another boat from the same source, the facility's juke box was manufactured outside the state and it played records manufactured outside the state. *Id.* at 308, 89 S.Ct. at 1702.

An equally broad definition of "affecting commerce" has been applied in labor cases. In *Polish National Alliance v. NLRB*, 322 U.S. 643, 64 S.Ct. 1196, 88 L.Ed. 1509 (1944), the Court held that the National Labor Relations Act applied to a fraternal organization providing death, disability and accident benefits to its members and their beneficiaries. In so holding, the Court looked, *inter alia*, to the organization's assets, including government bonds, its expenditures, and the effect a work stoppage would have on the stream of commerce of bills, notices, policies, advertising material, and radio dissemination. *Id.* at 644–45, 64 S.Ct. at 1197–98. *See also NLRB v. American Dist. Tel. Co.*, 205 F.2d 86 (3d Cir. 1953); *NLRB v. Suburban Lumber Co.*, 121 F.2d 829 (3d Cir.), *cert. denied*, 314 U.S. 693, 62 S.Ct. 364, 86 L.Ed. 554 (1941).

Numerous cases have applied the NLRA to non-profit and charitable organizations because they affect commerce. *See, e.g., Associated Press v. NLRB*, 301 U.S. 103, 128–29, 57 S.Ct. 650, 654, 81 L.Ed. 953 (1937) (non-profit news organization that did not sell news); *NLRB v. Southeast Ass'n for Retarded Citizens*, 666 F.2d 428, 430–31 (9th Cir.1982) (non-profit charitable organizations); *NLRB v. St. Louis Christian Home*, 663 F.2d 60, 62–63 (8th Cir. 1981) (non-profit emergency residential treatment center for battered, abused and neglected children); *NLRB v. Kent County Ass'n for Retarded Citizens*, 590 F.2d 19 (1st Cir.1978) (non-profit facility for the rehabilitation and training of retarded children and adults).

Martin has presented here evidence sufficient to defeat United Way's motion for summary judgment on the issue of whether it is engaged in an "industry affecting commerce" under Title VII and the ADEA. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986), the Court stated that "summary judgment will not lie ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." In the evidentiary hearing, Samuel Puffer, Associate Executive Director and Operations Manager of United Way, testified that United Way regularly submits 1% of its revenue to United Way of America, located in Alexandria, Virginia, which he referred to as the "parent company" and "service organization" for United Way; that United Way purchases various promotional supplies from United Way of America; that United Way has purchased other products from outside Pennsylvania; that United Way employees and staff travel out of state every year on United Way business; and that United Way makes approximately $300 annually worth of interstate telephone calls. In light of this evidence, as well as the evidence of receipts from the federal government and corporations engaged in interstate commerce and disbursements to agencies that are affiliates of organizations engaging in activities outside of Pennsylvania, we cannot say as a matter of law that United Way is not engaged in an industry affecting commerce under Title VII or the ADEA. Martin showed enough to create a genuine issue of material fact on the issue of jurisdiction over the United Way under the "affecting commerce" standard, and summary judgment for United Way on this issue was improper.

## IV.

## NUMBER OF EMPLOYEES

As an alternate basis for its grant of summary judgment to United Way on the ADEA claim, the district court held that United Way did not employ twenty or more employees for each working day in each of twenty or more calendar weeks during ei-

ther 1984 or 1985,[4] and thus did not qualify as an "employer" under 29 U.S.C. § 630(b). Martin based her jurisdictional claim on United Way's Staff Roster List, an internal document given to Martin, which listed more than twenty employees. United Way contended that two individuals on this list were not its employees, asserting that Joan Mulvin, who served as "CARE–RING Coordinator" for United Way, was actually an employee of another agency, and Susan Reeser, who worked as "Workplace Presence Coordinator" for United Way, was an independent contractor.[5]

In *EEOC v. Zippo Mfg. Co.*, 713 F.2d 32 (3d Cir.1983), we defined the standard to be applied in determining employee status under the ADEA as a hybrid of the common law "right to control" standard, and the "economic realities" standard applied to the Fair Labor Standards Act and the Social Security Act. Thus, we stated, " 'it is the economic realities of the relationship viewed in light of the common law principles of agency and the right of the employer to control the employee that are determinative.' " *Id.* at 37 (quoting *Cobb v. Sun Papers, Inc.*, 673 F.2d 337, 341 (11th Cir. 1982)).

We cannot say, applying the standard set out in *Zippo*, that as a matter of law, United Way did not employ twenty or more employees for twenty or more weeks in 1984 or 1985. If there is a genuine dispute as to whether an employer-employee relationship exists under the ADEA, the issue is a matter for the jury. *See, e.g., Hickey v. Arkla Industries, Inc.*, 699 F.2d 748 (5th Cir.1983). United Way admits to having employed nineteen or more employees for fifty weeks in 1984, and nineteen or more employees for forty-eight weeks in 1985.

The inclusion of either Joan Mulvin or Susan Reeser in either year would raise the number of employees to within the statutory limit.

The evidence presented reveals a genuine issue of fact as to whether Reeser was an employee under the ADEA. Reeser's position was funded by yearly grants, and she was hired under a term contract that denominated her as an "agent" of United Way. Under this contract, Reeser received neither fringe benefits nor vacations, and United Way withheld no income or social security taxes from her pay. On the other hand, Reeser was recruited and interviewed by United Way officials, and worked under the direct supervision of the Executive Director of United Way pursuant to a detailed job description. Under an amendment to Reeser's contract with United Way, which extended its duration indefinitely, Reeser was required to work a specified number of hours weekly,[6] and keep records of her hours. In addition, she was provided with an office and secretarial services, and could have been required to attend training courses at United Way's expense.

The evidence presented raises a jury issue as to whether Reeser was an "employee" subject to the control of United Way in the "means and manner" of her performance or whether she was an independent contractor. *See, e.g., First Catholic Slovak Ladies Ass'n*, 694 F.2d at 1070 (elected association directors who "performed traditional employee duties: maintaining records, preparing financial statements [and] managing the office" were employees under the ADEA), *cert. denied*, 464 U.S. 819, 104 S.Ct. 80, 78 L.Ed.2d 90 (1983).

---

**4.** The parties conceded before the district court that the relevant years were 1984 and 1985. *See* App. at 108.

**5.** The ADEA defines "employee" as "an individual employed by any employer." 29 U.S.C. § 630(f).

**6.** The original Agreement and the First Amendment to Attached Agreement provided for a total number of hours to be worked over the life of the contract. *See* App. at 188, 191. However, Samuel Puffer testified that:

No, she—It was in the agreement, which was introduced in evidence, we would furnish her secretarial services and office space, and she had to work "X" number of hours during the term of the agreement which was 30 hours per week, and keep adequate records which we could look at at any time. So, I think she pretty well set her own schedule. App. at 164. The extension of agreement, executed January 2, 1985, expressly provided for 30 hours' service weekly. *See* App. at 192.

Similarly, the evidence presented establishes a genuine issue of fact as to whether Joan Mulvin was an employee under the ADEA. Mulvin worked for several years as the coordinator of the United Way "CARE–RING" program, involving regular telephone contact with senior citizens and handicapped persons who live alone. Mulvin was on the salary of the Greater Erie Community Action Committee (GECAC) and was placed at United Way under a "Host Agency Agreement" under which GECAC was referred to as the "sponsor agency", and United Way was designated the "host agency". In addition to providing salary and benefits, GECAC was responsible under the Host Agency Agreement for approving the number of hours worked by Mulvin and paid for by GECAC; approving any significant changes in Mulvin's work schedule, responsibility or status within United Way; counselling Mulvin with regard to her performance; and imposing discipline.

On the other hand, evidence suggesting that Mulvin was an employee of United Way includes the fact that under the Host Agency Agreement, United Way was responsible for providing a job description to Mulvin, for providing orientation and training, for keeping time and attendance reports, and for keeping activity reports and evaluations. Mulvin was interviewed by United Way employees prior to obtaining her job, she had use of an office at United Way, and was supervised by a United Way employee, who according to Puffer, Associate Executive Director and Operations Manager of United Way, "probably generally" supervised Mulvin's day-to-day activities. App. at 162. This evidence is sufficient to create a genuine issue as to Mulvin's status as an "employee", thereby pre-

cluding its resolution on summary judgment.[7]

### V.

### CONCLUSION

For the foregoing reasons, the district court's order granting summary judgment to United Way will be reversed and the case remanded for further proceedings consistent with this opinion.

---

7. Martin also argues that the district court erred in limiting and later terminating her cross-examination of Puffer. In all instances except one, the district court did not abuse its discretion in limiting cross-examination. However, it should have permitted questioning of Puffer as to Federal funds, other than Federal Emergency Management funds, received by United Way because the information might have been relevant to the interstate commerce issue. Martin did not object to the district court's termination of

Puffer's examination and made no proffer of additional testimony she sought. Therefore, that ruling cannot be denominated an abuse of discretion.

Martin also challenges the district court's order on pleadings, motions and briefs staying all discovery pending an anticipated motion for summary judgment. In light of our reversal of the grant of summary judgment, we assume that the stay will be lifted.