**Antonio MALLARE, M.D., Plaintiff,**

v.

**ST. LUKE'S HOSPITAL OF BETHLEHEM, Defendant.**

**Civ. A. No. 86–7291.**

United States District Court, E.D. Pennsylvania.

Nov. 28, 1988.

Richard J. Orloski, Allentown, Pa., for plaintiff.

Brian M. Peters, A. James Johnston, Post & Schell, P.C., Philadelphia, Pa., for defendant.

## AMENDED MEMORANDUM

TROUTMAN, Senior District Judge.

Plaintiff Antonio Mallare completed a medical residency program in Obstetrics/Gynecology at defendant St. Luke's Hospital of Bethlehem in June, 1983 and was subsequently denied staff privileges there. Alleging that defendant's failure to act favorably upon his application for privileges was due solely to discrimination against him based upon national origin, plaintiff filed a charge of employment discrimination with the Equal Employment Opportunity Commission pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* After receiving a Notification of Right to Sue dated November 24, 1986, plaintiff filed this action on December 16, 1986.

Defendant St. Luke's Hospital has now moved for summary judgment, arguing that there was no employment relationship between plaintiff and the hospital at the time staff privileges were denied, thereby foreclosing plaintiff's claim under Title VII. Moreover, according to defendant, the evidence adduced in preparation for trial reveals no discrimination in the denial of staff privileges to the plaintiff. Consequently, defendant contends, it is entitled to summary judgment even if the Court concludes that plaintiff has sufficiently demonstrated an employment relationship between himself and the hospital such that he is protected by Title VII.

Defendant relies upon *E.E.O.C. v. Zippo Manufacturing Co.*, 713 F.2d 32 (3d Cir. 1983) to support its argument that plaintiff's claim fails for want of an employment relationship under Title VII. In *Zippo*, the court set forth the test to be applied in determining whether the plaintiff was an employee of the defendant for purposes of maintaining a claim under the Age Discrimination in Employment Act (ADEA). Not-

ing that, "[T]he 'prohibitions of the ADEA were derived *in haec verba* from Title VII'.", the court concluded that, "[T]he hybrid standard that combines the common law 'right to control' with the 'economic realities' as applied in Title VII cases is the correct standard for determining employee status under ADEA." 713 F.2d at 38 (Citation omitted).

■ Thus, defendant argues, and we agree, that the proper standard to apply to the determination of employment status for Title VII purposes in this Circuit is the hybrid standard described in *Zippo* in which the Court takes into account the economic realities of the situation presented but focuses on the employer's right to control the employee. In *Zippo*, the court also listed eleven factors which should be considered in reaching a decision as to the ultimate determinant of employment status, *viz.*, the extent to which the employer has the right to control 'the means and manner' of the ostensible employee's performance of the job. *Id.* at 37.

Relating the standard and applying it, however, involve vastly different levels of difficulty, no matter how straightforward said standard may appear. This observation is well illustrated by the more recent case of *Martin v. United Way of Erie County*, 829 F.2d 445 (3d Cir.1987). There the court was attempting to determine whether the United Way had the statutory minimum number of employees necessary to afford plaintiff the protections of Title VII and the Age Discrimination in Employment Act. The inquiry focused on whether two individuals who worked at the United Way office were actually employees of United Way for Title VII purposes. Although explicitly applying the *Zippo* factors, the court held that it was unable to determine, as a matter of law, whether the two individuals should be classified as employees. Rather, the court concluded that the determination was a matter for the jury, despite the facts that: neither employee was paid by United Way; neither received from United Way fringe benefits or vacations; United Way withheld no sums from either worker's paycheck for social security or income taxes. Moreover,

one of the employees in question had actually been hired and was paid, supervised and disciplined by another agency, having been placed at United Way by the other agency as part of a sponsor agency/host agency agreement in which United Way served as the host. Facts sufficient to create a jury issue with respect to the employment status of that individual included United Way's responsibilities for providing to her a job description, orientation and training, as well as keeping, for her, time and attendance records, activity reports and evaluations. The other individual was required to work a specified number of hours weekly and to keep records thereof. Both putative employees were also interviewed and supervised by United Way employees and were provided with office space and support staff by United Way. Having weighed these various factors, the court was unable to determine conclusively the extent to which United Way controlled the means and manner of those individuals' performance so as to classify them as employees or independent contractors. Hence, the case was remanded to the district court for a jury determination of the employment status of the two individuals, so that the court could ascertain whether United Way met the statutory minimum number of employees.

It is in light of the Court of Appeals' attempt to apply the *Zippo* factors in *Martin* that we, too, must attempt their application here. As in *Martin*, some of the factors indicating control and, hence, employee status are present while others are absent. Here, as in *Martin*, the putative employer furnishes the equipment used and the place of work, insofar as work at the hospital is concerned. Likewise, the services performed by doctors at the hospital are an integral part of the business of the hospital. On the other hand, as in *Martin*, the putative hospital/employer does not pay the doctor/employee, nor does it withhold social security or income taxes, afford him annual leave, retirement benefits or any other fringe benefits typically offered in an employment relationship. The doctor is not supervised by hospital personnel,

once training has been completed, and is engaged in a highly skilled occupation.

The three remaining *Zippo* factors, length of time the "employee" has worked, the manner of terminating the work relationship and the intention of the parties, do not readily fit the situation presented here. As in any Title VII case, length of service is meaningless when the claim is failure to enter into an employment relationship rather than a discriminatory discharge. With respect to termination of the relationship, the record is silent as to the manner of termination of staff privileges at St. Luke's. Presumably, however, once conferred, the privilege of practicing at the hospital cannot be terminated without notice and an explanation to the affected doctor. As to intention, it seems fairly clear that most doctors would not consider themselves employees of the hospitals at which they maintain staff privileges.

Thus, a simple counting of the eleven enumerated factors in the context of a doctor/hospital relationship would seem to weigh somewhat more heavily in favor of no employment relationship. We must keep in mind, however, that the factors themselves are mere aids in determining the ultimate question of control of the means and manner of the "employee's" job performance and that the Court is also required to consider the economic realities of the situation. When those general principles are also weighed in the balance, the question of the existence of an employment relationship for Title VII purposes becomes much closer. While control over the manner of job performance in the sense of supervision of discrete tasks is missing, ultimate control can be exercised by a hospital in the sense that privileges can be

withdrawn if a doctor's performance does not comport with hospital standards. Certainly, the withholding or withdrawal of staff privileges allows a hospital to control the means of a doctor's job performance to the extent that the work must be performed in a hospital setting, using hospital equipment and support staff.

Similarly, the consideration of economic realities adds to the balance on the side of Title VII coverage. A doctor who practices surgery or expects to deliver babies depends upon access to a hospital for his patients and is unlikely to attract many patients without such access. Where, as here, there is only one hospital in the area in which the doctor expects to practice, denial of staff privileges there severely limits, if it does not completely foreclose, the opportunity to develop a full practice in obstetrics/gynecology.

Upon consideration of all relevant factors, we conclude, as did the court in *Martin*, that we cannot say, as a matter of law, that the defendant is not the prospective "employer" of the plaintiff under the circumstances here present. Thus, following the lead of the Court of Appeals in *Martin*, we will reserve this question for jury determination at trial as an issue of fact.[1]

There is an additional factor relating to employment status here which merits our consideration as well. Plaintiff alleged and testified that it was understood, during his employment as a resident physician in the defendant hospital, that staff privileges would be granted, if he so desired, upon successful completion of the residency program.

In *Hishon v. King & Spalding*, 467 U.S. 69, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), the Supreme Court held that such a promise

---

**1.** We note, also, that the Court of Appeals for the Third Circuit has never specifically addressed the issue of whether Title VII applies to doctors who have been denied staff privileges. Other courts, however, have determined that Title VII jurisdiction extends to staff privileges cases. A variety of theories have been developed to support that conclusion, including *e.g.*, the notion that denial of staff privileges interferes with the actual or prospective employment relationship between doctor and patient, and that such a denial interferes with the employ-

ment contract between two private practitioners. *See, Pardazi v. Cullman Medical Center*, 838 F.2d 1155 (11th Cir.1988) and cases cited in n. 1 thereof.

Thus, considering the number of courts which have extended Title VII protections to this kind of situation, including one in this district, *Pao v. Holy Redeemer Hospital*, 547 F.Supp. 484 (E.D. Pa.1982), it is by no means certain that the Court of Appeals would apply *Zippo* in such a way as to foreclose the application of Title VII if confronted with the situation here present.

could be considered a term, condition or privilege of employment for Title VII purposes if established by the evidence.

While defendant denies that any such promise or guarantee was made to the plaintiff either before or during his participation in the residency program at St. Luke's, we conclude that there is sufficient conflict in the record on this issue to create a question of fact. Although it is true that the annual residency contracts between the plaintiff and defendant explicitly do not contemplate any guarantees of a future relationship, the contracts are not dispositive. Plaintiff testified at his deposition that he was told on several occasions by hospital officials that he would have no problem being accepted for staff privileges at St. Luke's upon successful completion of the residency program. It is for the factfinder to decide whether the prospect of future staff privileges actually was an implicit or explicit term, privilege or condition of employment when plaintiff was employed as a resident by the defendant.

Having thus concluded that we cannot, as a matter of law, determine from the record before us that plaintiff is not entitled to the protections of Title VII because of the lack of an employment relationship, we now turn to a consideration of defendant's second argument, that the record discloses no evidence of discrimination in defendant's denial of staff privileges to the plaintiff.

It is not entirely clear whether St. Luke's intends, by this argument, to assert that plaintiff failed to establish a *prima facie* case under Title VII or whether the argument is intended to assert that defendant has borne its burden of demonstrating a legitimate, nondiscriminatory reason for its action in response to plaintiff's *prima facie* case. Consequently, we will consider the issue in both contexts.

The standards for establishing a sufficient claim under Title VII are well known. Ultimately, the plaintiff is required to prove, by a preponderance of the evidence, that he or she was a victim of intentional discrimination because of membership in one of the protected classes enumerated in Title VII. *Gunby v. Pennsylvania Electric Co.*, 840 F.2d 1108 (3d Cir.1988). The courts have structured plaintiffs' journey on the way to discharging this ultimate burden with presumptions and shifting burdens of production of evidence. Plaintiff is first required to prove a *prima facie* case by demonstrating: (1) that he is a member of a class protected by Title VII; (2) that he is qualified for the position that was denied him; (3) that he was not given the position he sought; (4) that others not in the protected class were treated more favorably. *Jackson v. University of Pittsburgh*, 826 F.2d 230 (3d Cir.1987).

In this case, where plaintiff claims to have been a victim of intentional discrimination on the basis of national origin, we conclude that plaintiff has discharged his initial burden of proof, at least for summary judgment purposes. His nationality, Filipino, places him in a minority class protected by Title VII; he had successfully completed training as a resident physician, at St. Luke's Hospital itself, sufficiently demonstrating, we conclude, that he is qualified for staff privileges as a practicing physician there; defendant failed to accord him the staff privileges he sought; other residents, also trained at St. Luke's, but not members of the Filipino nationality, were granted staff privileges at the time that plaintiff applied.

Once the plaintiff has met his initial burden of establishing a *prima facie* case, the burden shifts to the defendant to produce evidence of a "legitimate, nondiscriminatory reason" for the defendant's rejection of plaintiff's application. *Logue v. International Rehabilitation Associates, Inc.*, 837 F.2d 150, 153 (3d Cir.1988) (Citation omitted). If the defendant's evidence creates a genuine issue of fact, the presumption of discrimination, which arose upon proof of the *prima facie* case, drops out. The plaintiff is then required to produce evidence that defendant's proferred reason was pretextual. *Id.*

■ Here, as noted, defendant argues that there is no evidence of discrimination in the denial of staff privileges, based, it appears, on plaintiff's lack of qualifications for the position. Whether considered as an argument to defeat an element of plain-

tiff's *prima facie* case or as a legitimate, nondiscriminatory reason for defendant's action as to which plaintiff has not and cannot produce any evidence of pretext, we cannot agree that the record clearly establishes that plaintiff was not qualified to practice his specialty.

It is true that defendant has produced evidence that the residency program at St. Luke's was inadequate at the time plaintiff was being trained there, (*See, e.g.,* Exh. E to Defendant's Motion for Summary Judgment at 46–50), which could support the inference that plaintiff was not qualified for staff privileges despite having successfully completed his training. The asserted deficiencies in the residency program, however, did not prevent other doctors trained at St. Luke's from acquiring staff privileges there. In fact, according to Dr. Skutches, defendant's witness, plaintiff was the only resident who successfully completed the residency program at St. Luke's and was then denied staff privileges there. (*Id.* at 45). Moreover, plaintiff's purported lack of qualifications did not prevent Dr. Skutches, the doctor in charge of the residency program at the time plaintiff completed it, from offering to recommend him for staff privileges anywhere else. (*Id.,* at 54–57).

There are at least two possible inferences from this evidence: plaintiff was, in fact, qualified for staff privileges at any hospital, including St. Luke's, or he was unqualified for privileges anywhere, but Dr. Skutches was completely unconcerned about his lack of qualifications as long as he did not practice at St. Luke's. The deposition testimony of Dr. Skutches undercuts the inference that plaintiff was denied staff privileges because he had been inadequately trained at St. Luke's. Dr. Skutches could not or would not state that any resident who had successfully completed the program at St. Luke's was not qualified to practice the specialty for which he was trained.

Similarly, the testimony also belies the contention that plaintiff was denied staff privileges because of his own deficiencies in basic knowledge. Dr. Skutches testified that another resident, whom he knew had scored poorly on a national examination, as had the plaintiff, was subsequently granted staff privileges. (*Id.,* at 38). Finally, even assuming that plaintiff's lack of basic knowledge and poor test performance was the motivating factor behind the denial of staff privileges, we are left with the unexplained fact that he successfully completed his residency, and, in fact, was chief resident in his final year in training at St. Luke's.

On a motion for summary judgment, the Court is required to draw all inferences in favor of the nonmoving party. *Jackson v. University of Pittsburgh.* Applying that principal, we must conclude that defendant has not unequivocally established that plaintiff was not qualified for staff privileges and/or that his asserted lack of qualifications is an irrefutably legitimate reason for the denial of privileges. For purposes of this motion, we must assume that plaintiff was qualified for staff privileges and was refused them for another reason. It is for the factfinder to determine whether the plaintiff will succeed in proving that the true basis for defendant's action in denying him staff privileges was discrimination against him because of his national origin, as he claims.

Finally, we cannot agree with defendant's argument that the record contains no positive evidence of any discriminatory motive in the denial of staff privileges to the plaintiff. Dr. Skutches' testimony permits an inference that he does not favor non-American doctors, particularly if they were not educated in American institutions. He testified that he would prefer an American graduate of an American institution. (*Id.* at 27). He also testified that American students educated in Caribbean medical schools had been admitted to St. Luke's residency program after he became director of the program, despite his belief that the accrediting body responsible for reviewing St. Luke's program had a preference for doctors educated in American institutions. (*Id.* at 28, 31). It is possible to infer that while Dr. Skutches, on behalf of St. Luke's, ostensibly bases his decisions as to doctors' qualifications on the place of their education, the truly determinative factor is nationality. Thus, it is possible to

infer that St. Luke's, through Dr. Skutches, discriminated against the plaintiff on the basis of his nationality. That inference is strengthened by Dr. Skutches's testimony that he was personally opposed to plaintiff's application. (*Id.* at 46).

In summary, we conclude that there are several issues of material fact which preclude summary judgment in this case. There are two separate issues relating to plaintiff's employment status which require a jury determination: first, whether, as an applicant for staff privileges he should be considered a potential employee or an independent contractor; second, whether the expectation of receiving staff privileges was a term, condition or privilege of employment as a resident at St. Luke's. If the fact adduced at trial result in a resolution in plaintiff's favor on either of those theories of Title VII protection, there are additional factual issues relating to plaintiff's qualifications as a practitioner and the reason or reasons why he was not granted staff privileges at St. Luke's. Consequently, defendant's motion must be denied.