**Celeste WALKER, Plaintiff,**

v.

**CORRECTIONAL MEDICAL SYSTEMS and County of Allegheny, Defendants.**

Civ. A. No. 94–203.

United States District Court, W.D.Pennsylvania.

May 16, 1995.

Gary F. Lynch, New Castle, PA, for plaintiff.

DeFalice & Coleman, P.C., Mary Kate Coleman, Pittsburgh, PA, for Correctional Medical Systems.

Allegheny County Law Dept., Caroline Liebenguth, Pittsburgh, PA, for County of Allegheny.

## OPINION
### and
## ORDER OF COURT

AMBROSE, District Judge.

Plaintiff Celeste Walker ("Walker") has filed this employment discrimination action seeking compensation for the alleged discriminatory conduct of Defendants Correctional Medical Systems ("CMS") and Allegheny County (the "County") arising out of her employment as a nurse at the Allegheny County Jail. Pending before the Court is the County's Motion for Summary Judgment. For the following reasons, the County's Motion will be granted.

### I. BACKGROUND.

The following facts are undisputed. Walker is an African–American Licensed Practical Nurse who was hired by CMS in August of 1991. At that time, CMS had entered into an agreement with the County to provide all health care services to the inmates at the Jail. The document setting forth the terms and conditions of the agreement between CMS and the County specifically states that CMS was an independent contractor and that neither CMS nor its personnel were to be considered employees of the County. (*Agreement*, Pl.Exh. 4 at 19.) Walker was assigned by CMS to work at the Jail and began working there in August of 1991.

Walker performed her work without incident for several months. On March 13, 1992, however, Walker inadvertently took home a set of keys belonging to the doors to the medical department of the Jail. (Walker Dep. at 38.) Walker knew that she was prohibited from taking home any keys belonging to the Jail, but she did not realize that she had the keys in her possession until after she had arrived home. (Walker Dep. at 30, 34.) Because Walker had worked the 3:00 p.m. to 11:00 p.m. shift that day, she did not arrive home until after midnight. (Walker Dep. at 31.)

What happened when Walker arrived home is not disputed by the County.[1] According to Walker, she telephoned the night nursing supervisor, Bernie Barndor, who was working at the Jail when Walker arrived home. (Walker Dep. at 35–36.) Walker told Nurse Barndor that she had accidently taken the keys home with her and that she had no way of getting back to the Jail because buses were unavailable at that time of night and because she did not have any money for a cab. (Walker Dep. at 34.) Nurse Barndor advised Walker that she had to return the keys, and Walker reiterated that she had no way of getting back to the Jail that night. Nurse Barndor asked Walker if she were scheduled to work the following day, and Walker advised Nurse Barndor that she was working the 3:00 to 11:00 p.m. shift the next day. Nurse Barndor then told Walker to bring the keys with her when Walker reported for her next shift, although Nurse Barndor did express some doubt about her ability to authorize Walker to wait until her next shift before bringing in the keys. (Walker Dep. at 29, 35.)

Walker did not return the keys to the Jail until the following afternoon, when she reported for her 3:00 to 11:00 p.m. shift. When Walker arrived at the Jail, she found everyone in the Medical Department in a "frenzy". (Walker Dep. at 39.) Apparently the only other set of keys providing access to the narcotics cabinet had been locked inside an office by other nurses on duty, and because Walker had in her possession the only other set of keys that could unlock the office, the medical staff had no access to certain medications that had to be administered. (Walker Dep. at 40–41.) A corrections officer issued a written report about the incident, which was subsequently reviewed by the warden at the Jail, Charles Kozakiewicz. Warden Kozakiewicz, upon learning of the

---

1. It is not clear whether CMS disputes these events, as CMS did not file a motion for summary judgment and has not filed a brief addressing the contentions of Walker and CMS as they relate to the County's motion for summary judgment.

fact that Walker had taken Jail keys home with her and had not returned them immediately upon discovering that she had them in her possession at home, withdrew Walker's security clearance and denied Walker access to the Jail so that Walker was temporarily "locked out" of the Jail until the issue was resolved. (Walker Dep. at 43; Kozakiewicz Dep. at 39.) Warden Kozakiewicz subsequently reinstated Walker's security clearance, and Walker received a "final warning" from CMS nursing supervisor Debbie Hunt regarding the key incident.[2] (Walker Dep. at 38, 153.)

After the key incident, Walker filed charges of discrimination with the Equal Employment Opportunity Commission because she believed she had been treated more harshly than other white nurses who had also taken keys home from the jail and had not returned them immediately. (Walker Dep. at 31, 154–155, 157–158.) Sometime after Walker filed her EEOC charge, Walker was fired from her position. The reason for the discharge, according to CMS, was that Walker had intentionally falsified medical records and had failed to follow proper procedures regarding record-keeping. (Walker Dep. at 67.) Walker, of course, believes that the reason offered by CMS was merely a pretext for the real reason, race discrimination and retaliation for filing the EEOC charge. She contends that other, white employees who allegedly made "intentional misrepresentations" in their record-keeping on a routine basis were not even scrutinized or disciplined, let alone terminated. (Walker Dep. at 111; James Aff. ¶¶ 6–7.)

Walker subsequently filed suit in this Court pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., alleging that Defendants discriminated against her on the basis of her race and retaliated against her when they denied her access to the Jail following the key incident, issued the "final warning", and ultimately discharged her. The County has moved for summary judgment, arguing that Walker is not an "employee" of the County for purposes of Title VII and that the evidence is insufficient to support a Title VII claim against the County.

## II. *LEGAL STANDARD.*

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ. Proc. 56(c). In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946, 949 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact, and an issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). Where the nonmovant will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### A. *Employee Status Under Title VII.*

The County first argues that summary judgment is appropriate because the evidence fails to show that Walker was an "employee" of the County for purposes of Title VII. Title VII prohibits employers from discharging an employee because of that employee's race or in retaliation for filing an EEOC charge. 42 U.S.C.A. § 2000e–2(a)(1) (1981). Because the protection of Title VII extends only to those who are "employees" and does not extend to "independent contractors," it is the plaintiff's burden to prove the existence of an employment relationship. *EEOC v. Zippo Manufacturing Co.*, 713 F.2d 32, 35 (3d Cir.1983).

---

2. The record is unclear as to exactly what constituted this "final warning".

520

Prior to the Supreme Court's decision in *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992), the Third Circuit Court of Appeals applied the so-called "hybrid test" to determine employee status. *See Zippo*, 713 F.2d at 35–38. The hybrid test combines the common law "right to control" test with an "economic realities test" developed by the United States Supreme Court to determine employee status under New Deal era legislation such as the Social Security Act. *Id.* In *Darden*, at issue was whether the plaintiff was an "employee" for purposes of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1371. The Supreme Court applied the "well-established principle" that where Congress does not helpfully define the term "employee," courts should use the common-law agency test to determine employee status. *Darden*, 503 U.S. at 322–25, 112 S.Ct. at 1348–49.

Clearly Title VII does not helpfully define the term "employee." It simply states that an employee is "an individual employed by an employer." 42 U.S.C. § 2000e(f). The question thus becomes whether the holding in *Darden*, which addressed employee status under ERISA, should be applied to determine employee status under Title VII. Several courts having addressed the issue have concluded that the holding in *Darden* has a broad implication for statutory construction and should be applied to employment discrimination cases. *See, e.g., Wilde v. County of Kandiyohi*, 15 F.3d 103, 105–106 (8th Cir. 1994) (Title VII); *Frankel v. Bally, Inc.*, 987 F.2d 86, 90–91 (2d Cir.1993) (ADEA); *Stouch v. Brothers of the Order of Hermits of St. Augustine*, 836 F.Supp. 1134, 1139 (E.D.Pa. 1993); *Lattanzio v. Security National Bank*, 825 F.Supp. 86, 89–90 (E.D.Pa.1993) (Title VII); *Cox v. Master Lock Co.*, 815 F.Supp. 844, 845–46 (E.D.Pa.1993) (ADEA).

■ This court believes that *Darden* requires application of the common-law agency test rather than a hybrid test in determining whether someone is an employee for purposes of Title VII. First, we agree that *Darden* was not limited in its application solely to ERISA claims but rather set forth a general rule of statutory construction in cases where Congress does not helpfully define the term "employer." *Frankel*, 987 F.2d at 90; *Stouch*, 836 F.Supp. at 1139. In addition, the definition of "employee" in ERISA, "any individual employed by an employer," 29 U.S.C. § 1002(6), is identical to that used in Title VII. Moreover, the Supreme Court explicitly rejected the directive announced in *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), the case upon which the hybrid standard is in large part based, calling *Silk* "feeble precedent[ ] for unmooring the term [employee] from the common law." *Darden*, 503 U.S. 318, 324–25, 112 S.Ct. 1344, 1349, 117 L.Ed.2d 581. For these reasons, we conclude that *Darden* requires application of the common-law agency test in determining employee status under Title VII.

■ *Darden* set forth the factors to be applied in determining employee status under the common-law agency test:

(1) the hiring party's right to control the manner and means by which the product is accomplished;

(2) the skill required;

(3) the source of the instrumentalities and tools;

(4) the location of the work;

(5) the duration of the relationship between the parties;

(6) whether the hiring party has the right to assign additional projects to the hired party;

(7) the extent of the hired party's discretion over when and how long to work;

(8) the method of payment;

(9) the hired party's role in hiring and paying assistants;

(10) whether the work is part of the regular business of the hiring party;

(11) whether the hiring party is in business;

(12) the provision of employee benefits; and

(13) the tax treatment of the hired party.

*Darden*, 503 U.S. at 322–24, 112 S.Ct. at 1348.

Many of these factors weigh in favor of a determination that Walker was not an employee of the County. For example, Walker was interviewed only by CMS personnel and not by anyone from the County when she initially applied for the position; the County does not pay Walker, nor does it provide her with retirement or other employee benefits; Walker's work is supervised only by CMS nursing supervisors, and not by anyone from the County; any performance evaluations are performed by CMS personnel and not by the County; the County does not establish Walker's work schedule, nor has either party argued that the work performed by Walker, providing health care services, is part of the regular business of the Jail.

On the other hand, there are some factors that weigh in favor of finding that Walker is an employee of the County for purposes of Title VII. Walker always reported to the Jail, and all her work was performed there. There is evidence that the County, at least initially, provided some of the medical supplies and equipment necessary for performance of the work. (*See* Pl.Exh. 4, *Agreement,* ¶¶ 6.1, 6.2, 7.4.)

Moreover, of the *Darden* factors, the greatest emphasis is placed on the hiring party's right to control the manner and means by which the work is accomplished. *Kellam v. Snelling Personnel Services,* 866 F.Supp. 812, 815 (D.Del.1994); *Stouch,* 836 F.Supp. at 1140 n. 5. Although Warden Kozakiewicz testified during his deposition that he had no input into the day-to-day operations of the CMS employees engaged in providing health care to the inmates, the Agreement between CMS and the County specifically provides that:

> CMS (personnel, management and contractors) shall perform as directed by the ... Warden or his designee. Warden shall limit his directives to matters pertaining to: termination of CMS personnel ...; calling meetings, and security matters; and directing CMS to examine a specific inmate. However, CMS shall perform in accordance with the Warden's directives regardless of whether CMS perceives said directives to be beyond the Warden's authority.

Pl.Exh. 4, *Agreement* ¶ 1.4. Taking the facts in the light most favorable to Walker, we are persuaded that the Warden at least had the right to terminate Walker and to assign additional duties to her, as well as to direct her to provide medical services to a particular inmate. Whether the fact that he may have rarely exercised that right would persuade a jury that Walker was not the County's employee is not for this Court to determine on a motion for summary judgment. From the evidence as a whole, we conclude that differing inferences could legitimately be drawn as to whether Walker was an employee of the County, and therefore the determination is properly a matter for the factfinder to resolve. *See Martin v. United Way of Erie County,* 829 F.2d 445 (3d Cir.1987) (in ADEA case, court held that "[i]f there is a genuine dispute as to whether an employer-employee relationship exists ..., the issue is a matter for the jury."); *Lilley v. BTM Corp.,* 958 F.2d 746, 750 n. 1 (6th Cir.1992) (citing *Martin, supra*) (where conflicting inferences can be drawn from the undisputed facts, the question is one for the factfinder to resolve).

Although we have concluded that *Darden* mandates the common-law agency test in determining employee status under Title VII, we note that our conclusion would be the same even if we applied the *Zippo* "hybrid" standard in determining whether Walker was the County's employee. Other courts have concluded that in practice there is very little difference between the hybrid test set forth in *Zippo* and the *Darden* common law agency test. *See, e.g., Stouch,* 836 F.Supp. at 1140 n. 5 ("there appears to be very little difference between the tests"); *Frankel,* 987 F.2d at 90 ("in practice there is little discernible difference between the hybrid test and the common law agency test"); *Cox,* 815 F.Supp. at 846 (same). Both tests place their greatest emphasis on the hiring party's right to control the manner and means by which the work is accomplished and consider a nonexhaustive list of factors as part of a flexible test of the "totality of the circumstances." *Cox,* 815 F.Supp. at 846.

The factors to be applied under *Zippo* include:

(1) the extent of the employer's right to control the "means and manner" of the worker's performance;

(2) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision;

(3) the skill required in the particular occupation;

(4) whether the employer or the individual in question furnishes the equipment used and the place of work;

(5) the length of time during which the individual has worked;

(6) the method of payment;

(7) the manner in which the work relationship is terminated;

(8) whether annual leave is afforded;

(9) whether the work is an integral part of the business of the employer;

(10) whether the worker accumulates retirement benefits;

(11) whether the employer pays social security taxes;

(12) the intention of the parties.

*Zippo*, 713 F.2d at 37. For the same reasons discussed above under the *Darden* analysis, we conclude under the *Zippo* hybrid factors that conflicting inferences can be drawn from the facts as to whether Walker was an "employee" of the County, and therefore summary judgment on this basis is inappropriate.

B. *Insufficient Evidence Under Pretext Theory.*

The County also contends that summary judgment must be granted because Walker has failed to produce any evidence of discrimination in the decision to withdraw Walker's security clearance and because there is no evidence that the Warden played any role in issuing a final warning to Walker or in terminating her. We find this argument has merit.

In general, intentional discrimination cases fall within one of two categories: "pretext" and "mixed motives" cases. *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 522 (3d Cir.1992). "Whether a pretext or a mixed-motives case has been presented depends on the kind of circumstantial evidence the employee produces in support of [his] claim of illegal discrimination." *Hook v. Ernst & Young*, 28 F.3d 366, 374 (3d Cir.1994). Walker apparently is proceeding under the pretext theory of discrimination.

In a pretext case, an employee argues that the employer's facially legitimate reason for the adverse employment decision is false and is merely a pretext disguising its real reason for the adverse decision, *i.e.*, discrimination. A pretext case follows the familiar process set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and *Texas Dep't. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252–56, 101 S.Ct. 1089, 1093–95, 67 L.Ed.2d 207 (1981).

Under the pretext theory, the plaintiff has the initial burden to establish a prima facie case of employment discrimination. *Burdine*, 450 U.S. at 252–55, 101 S.Ct. at 1093–95. A plaintiff establishes this prima facie case by demonstrating that he was a member of a protected class, that he was discharged from a position for which he was qualified, and that a person not within the protected class filled the position previously occupied by the plaintiff. *See St. Mary's Honor Center v. Hicks*, —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993). Once the prima facie case is established, a presumption of discrimination is established and the burden is then shifted to the defendant to produce evidence establishing a legitimate non-discriminatory reason for the adverse employment action.[3] *Id.* If the defendant meets this burden of production, the presumption of discrimination drops from the case; the plaintiff must then satisfy the ultimate burden of proving discrimination by showing that the employer's proffered expla-

---

**3.** It is important to note that while the burden of production shifts at this point, the ultimate burden of persuasion remains at all times with the plaintiff. *Hicks*, —— U.S. at ——, 113 S.Ct. at 2747.

nation was not the true reason for the employment decision and that race was. *Id.*

The Third Circuit Court of Appeals has recently summarized the summary judgment standard for Title VII pretext cases. When the defendant answers plaintiff's prima facie case with legitimate, nondiscriminatory reasons for its action, a plaintiff may defeat summary judgment in one of two ways: a plaintiff must either (1) present sufficient evidence "to meaningfully throw into question, i.e., to cast substantial doubt upon" the employer's proffered reason for its actions; or (2) produce sufficient evidence from which a factfinder could reasonably conclude that "an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994).[4] To discredit the employer's proffered reasons, a plaintiff must establish "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes,* 32 F.3d at 765. To show that an illegitimate factor was more likely than not a motivating cause of the adverse decision, a plaintiff could defeat summary judgment if he produced sufficient evidence showing that, *inter alia,* the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated similarly situated persons not of his protected class more favorably, or that the employer had previously discriminated against other members of his protected class. *Id.* This standard admittedly places a difficult burden on the plaintiff, but it is necessary to accommodate the competing interests between "the goal of discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." *Id.* (citing *Ezold,* 983 F.2d at 523 (3d Cir.1992).

In the present action, the County has submitted evidence that Walker's security clearance was withdrawn because she did not return the keys immediately upon discovering that she had taken the keys home with her. (Kozakiewicz Dep. at 42–43.) The County also has provided evidence that Warden Kozakiewicz did not know of any other CMS employees who had taken keys home with them, that he generally becomes aware of such incidents when a corrections officer files an incident report, and that the corrections officers might not always be aware that CMS employees had taken keys home with them. (Kozakiewicz Dep. at 36; Walker Dep. at 158.) Walker has responded to this by submitting the affidavit of Doreen James, in which she states that other white nurses had accidently taken keys home in the past and did not receive the harsh treatment that Walker received. (James Aff. ¶¶ 4, 5.) However, Ms. James does not state that the Warden knew of these other incidents, nor is there any other evidence in the record rebutting the Warden's assertion that he was not aware of any other "key" incidents. While Ms. James' affidavit might be enough to create a genuine issue of fact regarding CMS' actions, the "employer" at issue here is the County, not CMS. Nothing in the record suggests that the Warden's actions in withdrawing Walker's security clearance were a mere pretext for discrimination under the *Fuentes* standard enunciated above.

As to Walker's claims regarding issuance of the "final warning" and her ultimate termination, the County has provided evidence that Warden Kozakiewicz had no involvement in issuing Walker a final warning, nor did he have any involvement in the decision to terminate her. (Kozakiewicz Dep. at 47.) Walker herself testified during her deposition that she had no knowledge that anyone from the County was involved in terminating her. (Walker Dep. at 163). Walker's argument that Ms. James' affidavit is sufficient to preclude summary judgment

---

4. This standard differs from the burden at trial, where a plaintiff must prove *both* that the reason was false *and* that discrimination was the real reason for the employer's action. *St. Mary's Honor Center,* —— U.S. ——, ——, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993); *see also* *Fuentes,* 32 F.3d at 763. The factfinder's rejection of the employer's proffered explanation, together with the plaintiff's prima facie case, *permits,* but does not mandate, a verdict for the plaintiff. *Fuentes,* 32 F.3d at 763.

against both Defendants is unavailing. Nowhere in Ms. James' affidavit, indeed nowhere in the record before us, is there any evidence that the County, the "employer" at issue here, was involved in issuing Walker a final warning or in terminating her. Because Walker has failed to meet her burden under the *Fuentes* summary judgment standard with respect to the County, summary judgment will be granted in favor of the County on all Counts of the Complaint.

## ORDER OF COURT

**AND NOW,** this **16th** day of May, 1995, after careful consideration and for the reasons set forth in the Opinion accompanying this Order, it is hereby **ORDERED** that the Motion for Summary Judgment filed by Defendant Allegheny County (Docket # : 28) is **GRANTED** and Summary Judgment is **GRANTED** in favor of Defendant Allegheny County and against Plaintiff Celeste Walker in all counts of the Complaint.