563 A.2d 581

**PITTSBURGH BOARD OF PUBLIC EDUCATION, Petitioner,**

v.

**COMMONWEALTH of Pennsylvania, PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued May 4, 1989.

Decided Aug. 7, 1989.

Robert J. Stefanko, Pittsburgh, for petitioner.

Vincent A. Ciccone, Asst. Chief Counsel, Elisabeth S. Shuster, Chief Counsel, Harrisburg, for respondent.

Before CRAIG and DOYLE, JJ., and KALISH, Senior Judge.

DOYLE, Judge.

Before this Court is an appeal by the Pittsburgh Board of Education (Board) from an order of the Human Relations Commission (Commission) which found that Samuel Howard (Howard) had been discriminated against by the Board on the basis of his race in violation of Section 5(a) of the Pennsylvania Human Relations Act (Act).[1]

1. Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. § 955.

Howard was an employee of the Board from 1969 to 1986 and during that time he held numerous positions, such as substitute teacher, teacher, instructional teacher, senior coordinator and principal. On approximately October 10, 1974, Howard filed a complaint with the Commission alleging discrimination in the terms and conditions of his employment. Specifically, he alleged that the Board denied him equal salary, job classifications, promotional considerations and job duties and responsibilities as were granted to white males similarly situated. For inexplicable reasons not apparent in the record, the Commission did not render its decision in favor of Howard until August 1988.

The Board raises three issues for our review. First, it contends that Howard's complaint should have been dismissed on the grounds of the equitable doctrine of laches. Since the complaint was filed in 1974, and was not heard until 1987,[2] the Board asserts that this delay has imposed a financial burden upon it that would not have been as great had the Commission concluded its investigation in a "prompt fashion" in accordance with the dictates of Section 9 of the Act, 43 P.S. 959(b)(1).[3]

This issue has been settled by our Court in *Beaver Cemetery v. Pennsylvania Human Relations Commission*, 107 Pa.Commonwealth Ct. 190, 528 A.2d 282 (1987), *petition for allowance of appeal denied*, 518 Pa. 627, 541 A.2d 1138 (1988). In *Beaver Cemetery*, the complaint was filed in 1977 and was not heard by the Commission until June 1985, and the Commission was solely responsible for the delay. The Court held that when a complainant has acted with all due diligence in filing his/her complaint, the

2. The public hearings regarding this case began on March 9, 1987, approximately thirteen years and five months after Howard filed his complaint.

3. That provision provides:
After the filing of any complaint, or whenever there is reason to believe that an unlawful discriminatory practice has been committed, the Commission shall make a prompt investigation in connection therewith.

doctrine of laches will not bar relief or lessen the amount of the backpay award. We wrote:

> It would be inequitable under these facts to allow the invocation of an equitable doctrine against a complainant who has acted with all due diligence in filing within the relatively short limitations period. Under these circumstances, the complainant has as much to lose as the employer by reason of the delay....

*Id.,* 107 Pa. Commonwealth Ct. at 194, 528 A.2d at 284.

In the case *sub judice,* Howard timely filed his complaint and the Commission was solely responsible for the delay. Moreover, the burden from this inordinate delay was as great upon Howard as it was upon the Board. Had the Commission rendered a more expeditious decision, Howard would have had the benefit of a pay increment more than a decade ago. Therefore, for the reasons set forth in *Beaver Cemetery,* we decline to hold that Howard should be precluded from receiving a favorable determination on the basis of laches.

The Board next contends that the amount of backpay awarded to Howard should be reduced because of the Commission's lack of diligence in processing the complaint. After carefully reviewing this contention, we believe the Board has simply restated its first argument. The purpose of the doctrine of laches is to bar relief "when the complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice." *Id.* (quoting *Leedom v. Thomas,* 473 Pa. 193, 200, 373 A.2d 1329, 1332 (1977)). Here, the Board argues that due to the Commission's failure to act promptly, it has been significantly prejudiced by the accumulating amount of the award and interest. To reiterate, this issue is controlled by our decision in *Beaver Cemetery.* We cannot attribute the fault for the delay to Howard, and we do not believe he should suffer for the Commission's lack of due diligence. Therefore, we must reject the Board's argument.

■ The Board also argues that the Commission's finding of racial discrimination is not supported in the record. We do not agree. The respective burdens of proof in a disparate treatment case are as follows: First, the complainant must establish a *prima facie* case of discrimination. Second, if he/she should do so, the employer must rebut the inference of discrimination created by setting forth nondiscriminatory reasons for its conduct. Finally, in order to prevail, the complainant must show by a preponderance of the evidence offered that the reasons proffered by the employer were pretextual and that he or she was the victim of intentional discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission*, 516 Pa. 124, 532 A.2d 315 (1987).

■ As found by the Commission, Howard's allegations of discrimination stem from three separate incidents in which he was denied equal salary and position. On March 8, 1973, Howard was placed in the position of Instructional Leader for the Board's Secondary Opportunity School. Howard contends that upon this assignment, the Board improperly classified this job and, as a result, denied him equal pay because of his race. As the Commission properly observed, to make out a *prima facie* case of unequal pay, Howard had the burden to establish that his duties and responsibilities were substantially similar to those performed by the persons that he replaced and that he received less pay for performing them.

■ The Commission found, and the record supports the following facts: [4] Hayward, the white employee replaced by Howard, held the title "Coordinator" of the Secondary Opportunity School. Hayward was replaced because the

4. It is important to note that the Commission is the sole judge of the credibility of witnesses and it decides what evidence should be accepted as fact, what weight should be given to the evidence, and what inferences are to be drawn from the evidence. *Yuhas v. Workmen's Compensation Appeal Board (City of Pittsburgh)*, 82 Pa.Commonwealth Ct. 390, 476 A.2d 1377 (1984).

program under Hayward's supervision was described as being in a state of chaos. Howard gave unrebutted testimony that when he assumed the duties of Instructional Leader of the Secondary Opportunity School, he performed the exact same duties as had been performed by his predecessor, Hayward.

Additionally, after a short period in the Instructional Leader position, Howard was asked to assist the white "Coordinator" of the Elementary Opportunity School, Sisselsky. Howard did assist Sisselsky for approximately four months after which Sisselsky was transferred, and Howard assumed Sisselsky's duties over the Elementary Opportunity School in addition to this duties at the Secondary Opportunity School. Howard's testimony establishes that he performed the exact same duties and responsibilities as his white colleagues, yet his colleagues were considered "Coordinators" and earned salaries of $1,360.00 and $1,570.00 per month. Howard, however, held the position of "Instructional Leader," a position considered below the position of Coordinator, and, he received a salary of approximately $1,060.00 per month. The Commission also found that although in August 1983 Howard's title was changed to Senior Coordinator, his salary still remained less than the two white individuals he had replaced.

The Board attempted to rebut this evidence by presenting the testimony of its personnel director who testified that Howard's lower pay was "possibly" due to budget considerations. As for Howard's unequal job classification, the Board's personnel director testified:

at times positions are reclassified due to the differences in duties. I also think it has something to do with the budget. I do not control the various budgets of the departments, the recommendations that generally come from a department ... other than to say it's done for both reasons. Well, that's the easy way out.

The Commission found these reasons to be pretextual and

it was within its province to do so.[5]

The next event which Howard alleges demonstrates that the Board discriminated against him was a January 1974 reorganization of the Board's job classifications. Only three of the Board's employees held the title Senior Coordinator at the time of the reorganization: Howard and two long-standing white employees, Segall and Sebastian. After the reorganization, both Segall and Sebastian were classified at a Level V position and Howard was placed *one level lower* at Level VI.[6] Howard argues that once again he was the victim of disparate treatment because of his race.

The Board submits that this dispute amounts to nothing more than a simple disagreement over the relative worth of the positions in question. It contends that both Segall's and Sebastian's positions before reorganization were highly responsible system-wide positions while Howard's position was not system-wide and not as responsible. The record, however, contains substantial evidence that Howard's duties and responsibilities were concomitant with those of Segall and Sebastian, his white colleagues. Therefore, the Commission committed no error when it found that the reasons given by the Board for placing Howard at the Level VI position were pretextual.

Finally, in 1976, the Board reclassified Howard from his assigned Level VI position to a Level IV Administrator-in-Charge position, instead of a Principal position. Howard testified that he had always perceived his position as a

5. The Board makes the argument that the two charts used by the Commission to show salary differences between Howard, Hayward and Sisselsky were not introduced into evidence and, therefore, they could not be used to support its findings. We do not agree. We believe the charts were used by the Commission for the limited purpose of illustration. Both testimony and exhibits in the record clearly show that the two white coordinators did the same type of duties as Howard, yet they held higher job titles and received higher salaries.

6. It appears that the higher the position held by an employee of the Pittsburgh School District, the lower his level number will be. For example, a Principal's level number may be Level I, II or III, while a Coordinator is Level IX.

Principal level position and submitted lengthy testimony regarding the similarities between his position and that of a Principal. Following the 1974 reorganization, Principals were classified in Levels III, II and I. The actual level assigned to a particular position was determined primarily from enrollment size and number of staff supervised.

During his case-in-chief, Howard offered the testimony of five retired black administrators apparently in an effort to provide an overview of historical changes in the Board's school system with respect to improved administrative opportunities for blacks and other minorities within the system. These witnesses all testified that Howard had in fact been doing the same duties as a Principal. Throughout his tenure in the position, Howard had been considered an administrator of the Secondary Opportunity Schools by other administrators. The only difference appeared to be the size of enrollment and number of employees supervised.

Dr. Helen S. Faison, presently the Board's Deputy Superintendent for School Management testified. Dr. Faison's observation regarding Howard's pursuit of a Principal title was that, within the Board's large system, titles less than Principal were assigned to other programs comparable in size and staff to the Opportunity School Program. This evidence is not sharply contested in the record.

Because the evidence demonstrated that Howard's position entailed supervising fewer employees and a smaller student enrollment, the Commission determined that he was properly classified as a Level IV Administrator-in-Charge, rather than a Principal. It also determined, however, that he had been placed on the wrong step within that classification and that this was due to previous misclassifications he had suffered. Therefore, it directed that additional damages be paid to make up for his having been placed on the wrong step. We hold, after reviewing the record, that the Commission's findings in this regard are supported by substantial evidence.

Having thus determined that the Commission's adjudication was supported by substantial evidence and contained no errors of law, we affirm its order.

## ORDER

NOW, August 7, 1989, the order and award of the Pennsylvania Human Relations Commission in the above-captioned matter is hereby affirmed.

CRAIG, Judge, concurring.

This concurring opinion, in addition to confirming joinder in Judge Doyle's opinion for a unanimous panel of the Court, relates to the disturbing fact that the processing of the discrimination complaint in this case by the Pennsylvania Human Relations Commission extended over a period of more than thirteen years, from October of 1974 until August of 1988.

Concerned by the time span and the inability of counsel for the Commission to explain it at argument, this Court ordered that the Commission file a supplementary brief detailing and explaining the delay, with an opportunity to the Pittsburgh Board of Education to file a supplementary brief in reply. Both parties have filed supplementary briefs as ordered.

The Commission's chief plea is that, despite earnest attempts to obtain needed appropriations and legislative assistance, it has been understaffed and overworked, unable to process thousands of complaints efficiently. That plea causes more concern than it allays. If the delay in this case stemmed from a general lack of resources, rather than from any administrative failings peculiar to this particular case, are we to conclude that a number of other substantial complaints have required more than a decade to be resolved?

Close examination of the supplementary brief's chronology, which the Commission has forthrightly supplied, reveals that the Commission's work on the case was handled by a

succession of three principal investigators over the years. More significantly, the investigative process appears to have consisted of a long chain of correspondence with the Pittsburgh Board of Education, seeking information in an incremental manner, with inexplicably long periods between the time the Commission received information from the Board and the date of the next request for information issued by the Commission.

Four-and-one-half months elapsed between the Commission's receipt of an answer from the Board in November, 1974 until the Commission's next inquiry in March, 1975.

Another four-and-one-half-month lapse occurred between the time of the Board reply in early July of 1975 and the date of the Commission's next inquiry in late October, 1975.

After that, the pace slowed even more. Two years and nine months passed between the time of a Board reply in July, 1977 until the Commission sent another letter in late April, 1980.

One year and seven months transpired between a Board reply of May, 1980 and the next correspondence from the Commission on January 5, 1982.

There was an eight-and-one-half-month lapse between early February and late October of 1982, when the Commission dispatched its next letter.

Two years and one month passed between a Board response in November, 1982 and the next Commission inquiry in January of 1985.

A two-year period was required after the Commission was ready for a conciliation conference in January of 1985 until the Commission finally held its public hearing in February of 1987.

A year-and-a-half passed between the time of that public hearing and the issuance of the Commission's decision.

The Board was not faultless in contributing to the slow pace. The chronology reveals a four-and-a-half-month delay between the time the Commission sought information in

October, 1975 and the Board reply in March, 1976, and one year passed between a Commission inquiry of July 1, 1976 until June 27, 1977, when the Board finally completed supplying all of the information then requested.

The complainant, Samuel Howard, did not sleep on his rights. After an initial period of four months had passed, complainant Samuel Howard wrote to the Commission, expressing concern over the delay in the investigation of his complaint.

Although the Commission doubtless has struggled against a shortage of personnel in the face of a great workload, questions necessarily arise concerning the effectiveness of an investigative process which consists of the seemingly desultory issuance of inquiry letters, with intervals of months and years between the receipt of information and the next inquiry.

This case is not the first discrimination case before this Court which has evidenced a long delay. *Beaver Cemetery v. Pennsylvania Human Relations Commission*, 107 Pa. Commonwealth Ct. 190, 528 A.2d 282 (1987), *petition for allowance of appeal denied*, 518 Pa. 627, 541 A.2d 1138 (1988), as noted in the Court's unanimous opinion, involved an eight-year delay. The concern felt by this Court, in encountering such system delays after the fact, is increased by the realization that the few cases which come up on appeal represent only a small fraction of the whole picture.

As pointed out in this Court's opinion by Judge Doyle, all parties in the matter are disadvantaged by the passage of time. The complainant—whose complaint has now been found to be justified by the Commission and this Court—has undeniably suffered an aggravation of the fundamental injury, but even the respondent Board is now faced with an obligation to pay a dollar amount of backpay much greater than what would be involved in a case handled with dispatch.

Because of the truth of the familiar statement that justice delayed is justice denied, we take this opportunity to make a

record with respect to the serious time problem which exists in resolving discrimination issues, to encourage a solution, not only by the Commission, but by the executive branch and the legislative branch as well.