**Warren William STOUCH,**

v.

**BROTHERS OF the ORDER OF HERMITS OF ST. AUGUSTINE, t/a Saint Thomas Monastery, and Reverend William A. McGuire, and Villanova University.**

**Civ. A. No. 92–7055.**

United States District Court, E.D. Pennsylvania.

Sept. 27, 1993.

Michael J. McCaNey, Jr., Boroff, Harris & Heller, P.C., Steven Kapustin, Plymouth Meeting, PA, for plaintiff.

William F. Sweeney, Schubert, Bellwoar, Mallon & Walheim, Philadelphia, PA, for Brothers of the Order of Hermits of Saint Augustine and Reverend William A. McGuire.

Lisa Bazemore, Marina C. Tsatalis, Morgan, Lewis & Bockius, Philadelphia, PA, for Villanova University in the State of Pennsylvania.

## MEMORANDUM

GILES, District Judge.

Warren William Stouch ("Stouch") brings this action under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and pendent state law claims. Defendants have moved for summary judgment. For the reasons stated below, the motion of defendant Villanova University ("Villanova") is granted, and the motion of defendants Brothers of the Order of Hermits of St. Augustine ("the Brothers") and Reverend William A. McGuire ("McGuire) is granted in part and denied in part.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is to be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Where, as here, the non-moving party has the burden of proof at trial, the movant need not produce evidence negating the non-movant's case. Instead, the moving party need only demonstrate that there is a lack of evidence to support the non-movant's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Once the movant satisfies this initial burden, the non-movant cannot rest solely upon the allegations in the pleadings. Fed. R.Civ.P. 56(e). Instead, the it must demonstrate that there is sufficient evidence for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *Id.*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

## II. THE PARTIES AND FACTUAL BACKGROUND

Stouch served from 1982 until October 5, 1991 as the chef at St. Thomas Monastery ("the Monastery"). Deposition of Warren William Stouch ("Stouch Dep.") at 16–17.

The complaint names as a defendant the "Brothers of the Order of Hermits of St. Augustine, t/a Saint Thomas Monastery." In its motion for summary judgment, the Brothers of the Order of Hermits of St. Augustine ("the Brothers") alleges that " 'Brothers of the Order of Hermits of St. Augustine' is a Civil Law Corporation which does not do business as Saint Thomas Monastery." In support of this claim, the Brothers submit an affidavit from the Very Reverend John Hagen, OSA, Prior Provincial of the Province of St. Thomas of Villanova ("Hagen"). Hagen states:

> The Order of St. Augustine is a Religious Institute of the Roman Catholic Church and operates internationally. The Prior General of the Order of St. Augustine resides in Rome, Italy. Governance of the Order is established in a document known as the Constitutions of the Order of St. Augustine....
>
> In the Commonwealth of Pennsylvania there exists a Civil Corporation known as the Brothers of the Order of Hermits of St. Augustine. The Civil Law Corporation owns real property in various parts of the United States among which is included the property known as St. Thomas Monastery....
>
> St. Thomas Monastery is a local chapter in which reside some (approximately 65 at the time in question) of the members of the Eastern Province of the Order of St. Augustine in the United States. In my capacity as Prior Provincial of the Province of St. Thomas of Villanova I do not control or regulate the operation of St. Thomas of Villanova Monastery. The operation of St. Thomas of Villanova Monastery is conduct-

> ed under the auspices of the Prior of St. Thomas of Villanova Monastery, Reverend George Burnell in accordance with Chapter 15 of the Constitution of the Order of St. Augustine.
>
> St. Thomas of Villanova Monastery is the home or residence of these men living together pursuant to the religious vows of poverty, chastity and obedience taken by all members of our Order.

Affidavit of Reverend John Hagen ("Hagen Aff.").

By this affidavit, defendants appear to make a distinction between a "Religious Institute of the Roman Catholic Church" known as "the Order of St. Augustine" ("the Order"), a corporation known as "Brothers of the Order of Hermits of St. Augustine" ("the Brothers"), and "St. Thomas of Villanova Monastery" ("the Monastery").[1] However, it is undisputed that the Brothers own the Monastery and the land upon which it sits, *see* Affidavit of Reverend William McGuire ("McGuire Aff."), and the 1099 tax forms filed in regard to the payment for Stouch's services at the Monastery show the payor as "Brothers of the Order of Hermits of St. Augustine, Saint Thomas Monastery, Villanova, PA 19085." Plaintiff's Exhibit "J." From this record, the court cannot determine as a matter of law what was the relationship between the Brothers and the Monastery. Therefore, to the extent that this relationship is material, we must assume that the relationship between the Brothers and the Monastery is as alleged by Stouch, and we will refer to this defendant interchangeably as "the Monastery" or "the Brothers."

Administration of the Monastery is conducted by the Prior, Reverend George Burnell, his Sub–Prior, his Counsel and defendant McGuire as Treasurer, pursuant to the provisions of the Constitutions of the Order of St. Augustine. McGuire Aff.; Hagen Aff. In his position as the Monastery's treasurer, McGuire was at all relevant times responsible for the preparation and administration of

---

1. All parties appear to use the terms "St. Thomas of Villanova Monastery" and "St. Thomas Mon- astery" interchangeably.

the budget as approved by the Prior and the local Community. McGuire Aff.

Villanova is a private non-profit educational institution which provides undergraduate and graduate classes to the public. Affidavit of G. Thomas Bull ("Bull Aff.") ¶ 2. Villanova has no ownership interest in the Monastery. Bull Aff. ¶ 3. Although the Monastery is physically located on Villanova's campus, Villanova does not own the Monastery building or the land upon which its sits. Exhibit "B" to Villanova's Motion for Summary Judgment at ¶ 14.

During the summer of 1991, Stouch was informed by McGuire that the Monastery had decided to terminate its relationship with him. After several extensions of the termination date, Stouch finally left the monastery in October 1991.

The Complaint contains three Counts against all defendants. Count I alleges that Stouch's employment was terminated because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Count II alleges that the age discrimination alleged in Count I also violated the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 *et seq.* Count III alleges that the defendants' actions constitute the tort of intentional infliction of emotional distress under Pennsylvania law. Defendants have moved for summary judgment as to all three counts.

### III. DEFENDANTS McGUIRE AND THE BROTHERS

Defendants McGuire and the Brothers have moved for summary judgment on several grounds. For the reasons stated below, the court denies their motions as to Counts I and II (the ADEA and PHRA counts), but grants the motions as to Count III (intentional infliction of emotional distress).

2. The appropriate legal analysis is very similar for ADEA and PHRA claims. *See, e.g., Gottlieb v. Ladd Furniture, Inc.,* Civil Action No. 91–351, 1992 WL 174617 at *5–6 (E.D.Pa., July 14, 1992); *Koprowski v. Wistar Institute of Anatomy and Biology,* Civil Action No. 92–1132, 1993 WL 106466 (E.D.Pa., April 6, 1993). The parties have not pointed to any significant differences between ADEA and PHRA as they relate to these motions for summary judgment.

### A. ADEA and PHRA Claims

McGuire and the Brothers present several arguments as to why summary judgment should be granted in their favor on Count I (ADEA), and Count II (PHRA).[2] First, they argue that Stouch was not an employee of the Brothers, and therefore not entitled to sue under either statute. Next, they argue that even if Stouch was an employee, he cannot sustain his burden of proving that his termination was because of his age. Finally, they argue that to apply ADEA or PHRA to this case would violate the free exercise and anti-establishment clauses of the first amendment. The court rejects all of these arguments.

### 1. There exists a genuine issue of material fact as to whether the Brothers and McGuire were Stouch's employers

ADEA forbids "age discrimination by employers against employees and applicants for employment." *E.E.O.C. v. Zippo Mfg. Co.,* 713 F.2d 32, 35 (3d Cir.1983) (quoting *Levine v. Fairleigh Dickinson University,* 646 F.2d 825, 828 (3d Cir.1981)). Therefore, if the Brothers or McGuire were not "employers" under ADEA, or if Stouch was not an "employee", his ADEA claim must be dismissed. *Zippo.*

Under ADEA, an employer is defined as "a person engaged in an industry affecting commerce who has twenty of more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year." 29 U.S.C. § 630(b).[3] "Person" is defined as "one or more individuals, partnerships, associations, labor organizations, corporations, business trusts, legal representatives, or any organized group of persons." 29 U.S.C. § 630(a). The Brothers is a Pennsylvania corporation, and therefore is a "person" under ADEA. There is no

3. Under PHRA, the "term 'employer' with respect to discriminatory practices based on ... age ... includes religious, fraternal, charitable and sectarian corporations and associations employing four or more persons within the Commonwealth." 43 P.S. § 954(b).

claim by the Brothers that it has fewer than twenty employees. Therefore, there exists a genuine issue of material fact as to whether the Brothers is an "employer" under ADEA. ADEA also defines "employer" to include any agent of an employer. 29 U.S.C. § 630(b). Because a jury could find from the evidence presented that McGuire served as the Brothers' agent in regard to the relationship with Stouch, there also exists a genuine issue of material fact as to whether McGuire was an "employer" under the act.

Of course, it is not enough that defendants are "employers" under ADEA. For a jury to find them liable, it must also conclude that Stouch was their "employee." Defendants argue that they were not employers of Stouch, but rather that he was an independent contractor and an employee of a corporation known as "Expressions by J.R." The court, however, finds a genuine issue of material fact as to whether Stouch was an "employee" of the Brothers and of McGuire.

It is undisputed that the formal relationship between Stouch and the Brothers was that the Brothers contracted with a corporation formed by Stouch and known as "Expressions by J.R." *See, e.g.*, Affidavit of Reverend William McGuire.[4] However, the fact that Stouch was formally an independent contractor does not dispose of the question of whether he was an "employee" for the purposes of the ADEA. *See, e.g., Golden v. A.P. Orleans, Inc.*, 681 F.Supp. 1100 (E.D.Pa. 1988) (real estate broker was employee, for purposes of ADEA, of development despite contract classifying broker as independent contractor).

The ADEA does not helpfully define the term "employee." It simply states that an "employee" is "an individual employed by any employer." 29 U.S.C. § 630(f). The third circuit has held that the appropriate test for determining when someone is an "employee" under ADEA is a so-called "hybrid standard" that combines the common law "right to control" test with an "economic realities" test developed by the United States Supreme Court to determine employee status

under New Deal era legislation such as the Social Security Act. *Zippo*, 713 F.2d at 35–38; *accord Martin v. United Way of Erie County*, 829 F.2d 445, 451 (3d Cir.1987). Recently, however, the United States Supreme Court held that in statutes where Congress does not helpfully define "employee," courts should use the common-law agency test. *Nationwide Mutual Insurance Co. v. Darden*, —— U.S. ——, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992).

Although *Darden* was an ERISA case, its implications for the statutory construction are broad. First, *Darden* announced a general rule of statutory construction which is in no way limited to ERISA. *See, e.g., Darden*, —— U.S. at ——, 112 S.Ct. at 1348 ("well established principle" that where Congress uses terms that have accumulated settled meaning under common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms). In addition, the definition of "employee" in ERISA, "any individual employed by an employer," 29 U.S.C. § 1002(6), is essentially identical to that used in ADEA. Finally, the *Darden* Court explicitly repudiated *United States v. Silk*, 331 U.S. 704, 713, 67 S.Ct. 1463, 1468, 91 L.Ed. 1757 (1947), the standard upon which the hybrid test was based in large part. *Darden* requires that the "hybrid" test previously articulated by the third circuit be abandoned in favor of common-law agency principles. Other courts have considered the effect of *Darden* on Title VII and ADEA, and have reached the same conclusion. *Frankel v. Bally, Inc.*, 987 F.2d 86, 90–91 (2d Cir.1993) (ADEA); *Lattanzio v. Security National Bank*, 825 F.Supp. 86, 89–90 (E.D.Pa.1993) (Title VII); *Cox v. Master Lock Co.*, 815 F.Supp. 844, 845–46 (E.D.Pa. 1993) (ADEA).

The common law test for distinguishing between an "employee" and an independent contractor was summarized by the *Darden* Court.

---

4. Expressions by J.R. was incorporated in Delaware in November of 1985. Stouch and Joseph R. Avellino were the sole stockholders in the corporation, and each received a paycheck from the corporation. Stouch Dep. at 25.

**1140**

In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

—— U.S. at ——–——, 112 S.Ct. at 1348–49 (quoting *Community for Creative Non–Violence v. Reid,* 490 U.S. 730, 751–52, 109 S.Ct. 2166, 2178–79, 104 L.Ed.2d 811 (1989)).[5] Given the evidence presented to the court on this issue, we cannot determine as a matter of law that Stouch was not an employee of the Monastery.

Some of the facts weigh in favor of employee status for Stouch. The Monastery provided both the equipment used and the place of work, and all work was performed at the Monastery. Stouch Dep. at 52. Stouch had worked as a chef at the Monastery for approximately ten years at the time he was dismissed. Deposition of Reverend William McGuire ("McGuire Dep.") at 35. He was given an annual pay increase on June 1, the same date that employees received their annual pay raises. McGuire Dep. at 39. Stouch had assistants who were hired and fired by Father McGuire. Stouch had no authority to hire and fire his assistants or to

set their pay rates. Stouch Dep. at 42, 52; McGuire Aff. at 45–46. McGuire had authority for final approval to schedule overtime for food service staff. McGuire Dep. at 54. Stouch had to provide McGuire with a monthly report and breakdown of meals served. McGuire Dep. at 55. Stouch had to post a weekly menu one week in advance. Stouch Dep. at 42. He had to report on staff performance to McGuire. Stouch Dep. at 43, 55. Finally, we note that Stouch's replacement was described by McGuire as an employee of the Monastery, receiving a salary and fringe benefits. McGuire Aff.

Several factors weigh against Stouch being considered an employee. Although there was no written agreement between the parties, it is undisputed that Stouch intended the relationship to be one of independent contractor. After Stouch had served several years as chef for the Monastery, he and one other person formed a corporation called "Expressions by J.R." Stouch Dep. at 25. In 1985, Stouch asked McGuire to begin paying the corporation directly for his services in order to circumvent a problem he was having with the Internal Revenue Service. Stouch Dep. at 17–18. The Brothers paid Expressions by JR for Stouch's services from that time until their relationship was terminated in 1991 and reported those payments to the IRS on Form 1099 for nonemployee compensation. Stouch Dep. at 17–18; Exhibit "G" to Villanova's Motion for Summary Judgment (IRS 1099 forms). In turn, Stouch reported to the IRS that he received a salary from Expressions by J.R. of approximately $12,000 in 1988, $13,000 in 1989, $13,000 in 1990 and $10,000 in 1991, each figure approximately between one-fourth and one-third of the total amount paid by the Brothers to Stouch's corporation. Exhibit "F" to Villanova's Motion for Summary Judgment. The

---

5. Although we conclude that the "hybrid" right to control/economic realities test announced in *Zippo* has been supplanted by the common law agency test described in *Darden,* courts and commentators have noted that there appears to be very little difference between the tests. *See, e.g., Frankel,* 987 F.2d at 90 ("in practice there is little discernible difference between the hybrid test and the common law agency test"); *Cox,* 815 F.Supp. at 846 (most of the twelve factors utilized by the third circuit in its hybrid test reflect

common-law agency principles and both tests place the greatest emphasis on the hiring party's right to control the manner and means by which the work is accomplished); Patricia Davidson, *The Definition of "Employee" Under Title VII: Distinguishing Between Employees and Independent Contractors,* 53 U.Cin.L.Rev. 203 (1984) ("hybrid" test, with some modifications, is recital of the common law factors listed in the *Restatement (Second) of Agency* § 220(2) (1958)).

Brothers did not pay social security taxes for Stouch. Stouch did not accumulate retirement benefits or any other employee benefits, other than vacation pay as described above. McGuire Dep. at 38; Stouch Dep. at 85. The position of head chef is a skilled one.

Other factors are disputed or are ambiguous. Stouch's corporation received regular bi-weekly payments for his services. McGuire Dep. at 38. However, because the same number of meals was prepared each week, it is not clear that this regular payment makes his pay analogous to a salary or to payment by the job. There is a dispute about whether or not Stouch received vacation pay. Stouch deposed that he did receive vacation pay. Stouch Dep. at 85. When deposed, McGuire stated that Stouch did not receive vacation pay. McGuire Dep. at 38. He did acknowledge that Stouch was paid every week of the year and that he took vacations. He also acknowledged that "towards the end" of Stouch's association with the Monastery, the Monastery paid overtime to other employees for extra work necessitated by Stouch's absence on vacation. *Id.*

Differing conclusions could reasonably be drawn about whether Stouch's work · was "part of the regular business" of the Monastery. If one focusses upon the religious aspects of the Monastery, Stouch's services may not seem to be an integral part of its "business." However, if one focusses upon the Monastery's status as a residence for approximately 65 men, the provision of meals may appear integral to the mission.

Stouch had some autonomy in setting his own work schedule. He could work "flexible" shifts. Sometimes he worked the morning, breakfast and lunch shift. At others periods, he worked the evening, dinner, shifts. He decided when he would do each. However, he did have to work five or six days of the week, and so was not completely free to complete the work on his own schedule. Stouch Dep. at 52.

Usually, Stouch was not directly supervised in meal preparation or in the day-to-day performance of his work by anyone from the Monastery, except in a few instances. Stouch Dep. at 43. No one ever came into the kitchen and directed him how to prepare meals. Stouch Dep. at 43. However, on several occasions McGuire requested that Stouch use more fresh vegetables and increase the variety of the meals served. McGuire Dep. at 66–68. McGuire did order Stouch not to put wrapped toothpicks in the dining room, and did order him to purchase cereal in smaller boxes. Stouch Dep. at 54. He also told Stouch to be less "aggressive" with the staff. Stouch Dep. at 54. Stouch ordered the food and prepared the menus.[6] McGuire Dep. at 43. However, McGuire had final approval authority for what vendors would be used. McGuire Dep. at 55; Stouch Dep. at 43. McGuire negotiated payment arrangements with the vendors. Stouch Dep. at 43.

From this evidence the court concludes that there is a genuine issue whether Stouch was an employee of the Brothers. *See Martin*, 829 F.2d at 451–52;[7] *Mallare v. St.*

---

6. On special occasions, Stouch gave a list of three choices to McGuire from which McGuire chose one. McGuire Dep. at 43.

7. In *Martin*, the third circuit found a genuine issue of material fact as to whether Susan Reeser was an employee of United Way when the evidence presented showed that: Reeser's position was funded by yearly grants, and she was hired under a term contract that denominated her as an agent of United Way. Under that contract, Reeser received neither fringe benefits nor vacations, and United Way withheld no income or social security taxes from her pay. On the other hand, Reeser was recruited and interviewed by United Way officials, and worked under the direct supervision of the Executive Director of United Way pursuant to a detailed job description. Under an amendment to Reeser's contract with United Way, which extended its duration indefinitely, Reeser was required to work a specified number of hours weekly, and keep records of her hours. In addition, she was provided with an office and secretarial services, and could have been required to attend training courses at United Way's expense. 829 F.2d at 451 (footnote omitted). Similarly, the court found a genuine issue of material fact as to whether Joan Mulvin was an employee of United Way when the evidence showed that: Mulvin worked for several years as the coordinator of the United Way "CARE–RING" program, involving regular telephone contact with senior citizens and handicapped persons who live alone. Mulvin was on the salary of the Greater Erie Community Action Committee (GECAC) and was placed at United

*Luke's Hospital,* 699 F.Supp. 1127 (E.D.Pa. 1988). In particular, from the lack of involvement by defendants in Stouch's day-to-day work, a jury could reasonably infer that defendants did not have the "right to control the means and manner of the worker's performance," or it could infer that while defendants had that right, as evidenced by the above-described examples, they rarely exercised it. As the fifth circuit court of appeals has explained,

> The determination of employment status is a mixed question of law and fact. Normally, a judge will be able to make this determination as a matter of law. However, where there is a genuine issue of fact or conflicting inferences can be drawn from the undisputed facts, as here, the question is to be resolved by the finder of fact in accordance with the appropriate rules of law.

*Lilley v. BTM Corp.,* 958 F.2d 746, 750 n. 1 (6th Cir.1991) (citing *Martin,* 829 F.2d at 451)), *cert. denied,* —— U.S. ——, 113 S.Ct. 376, 121 L.Ed.2d 287 (1992). Here, whether Stouch was an employee of the Brothers for purposes of ADEA, at least at this stage of development of the evidence, is a question for the jury.[8]

> *2. There exists a genuine issue of material fact as to whether Stouch can carry his burden of proof*

■ Under both ADEA and PHRA, Stouch has the burden of proving by a pre-

ponderance of the evidence that his "employment" at the Brothers was terminated because of his age. *White v. Westinghouse Elec. Co.,* 862 F.2d 56, 59 (3d Cir.1988); *Sorba v. Pennsylvania Drilling Co.,* 821 F.2d 200, 202 (3d Cir.1987), *cert. denied,* 484 U.S. 1019, 108 S.Ct. 730, 98 L.Ed.2d 679 (1988); *Caterpillar Tractor Co. v. Commonwealth, Pennsylvania Human Relations Com.,* 78 Pa.Cmwlth. 86, 466 A.2d 1129 (1983).

■ The burden of proof in ADEA cases is governed by the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[9] Stouch has the initial burden of establishing a *prima facie* case of discrimination. If a plaintiff succeeds in establishing a *prima facie* case, a presumption of unlawful discrimination is created and the burden of production shifts to the defendant to articulate some legitimate non-discriminatory reason for the discharge. If the defendant articulates reasons for the termination which would support a finding that unlawful discrimination was not the cause of the termination, the presumption raised by the *prima facie* case is rebutted and drops from the case. The plaintiff then must demonstrate that the proffered reasons were not the employer's true reasons; that is, they were a mere pretext for intentional age discrimination. *St. Mary's Honor Cen-*

Way under a "Host Agency Agreement" under which GECAC was referred to as the "sponsor agency," and United Way was designated the "host agency." In addition to providing salary and benefits, GECAC was responsible under the Host Agency Agreement for approving the number of hours worked by Mulvin and paid for by GECAC; approving any significant changes in Mulvin's work schedule, responsibility or status within United Way; counselling Mulvin with regard to her performance; and imposing discipline. On the other hand, evidence suggesting that Mulvin was an employee of United Way includes the fact that under the Host Agency Agreement, United Way was responsible for providing a job description to Mulvin; for providing orientation and training, for keeping time and attendance reports, and for keeping activity reports and evaluations. Mulvin was interviewed by United Way employees prior to obtaining her job, she had use of an office at United Way, and was supervised by a United Way employee, who according to Puffer, Associate Executive Director

and Operations Manager of United Way, "probably generally" supervised Mulvin's day-to-day activities. 829 F.2d at 452.

8. For the same reasons, there exists a genuine issue of material fact whether Stouch was an employee for the purposes of his PHRA claim. *See Gottlieb,* 1992 WL 174617 at *5 (same principles for determining employee status under ADEA also apply to PHRA).

9. The same shifting of the burden of production analysis that is applied to ADEA cases is also applied to cases brought under PHRA. *See, e.g., Pittsburgh Board of Public Education v. Commonwealth, Pennsylvania Human Relations Com.,* 128 Pa.Cmwlth. 324, 563 A.2d 581 (1989); *Dutka v. Coopers & Lybrand,* Civil Action No. 92–2758, 1993 WL 142902 at *3 (E.D.Pa., May 4, 1993); *see also Griffiths v. CIGNA Corp.,* 988 F.2d 457, 469 n. 10 (3d Cir.1993) (PHRA pretext cases are considered under the same analysis as cases brought under Title VII).

ter v. Hicks, —— U.S. ——, —— – ——, 113 S.Ct. 2742, 2746–48, 127 L.Ed.2d 407 (1993); *Sorba*, 821 F.2d at 202.

■ Because Stouch bears the burden of persuasion to show that he was the victim of intentional age discrimination, defendants are entitled to summary judgment if they can demonstrate that Stouch could not possibly carry his burden of proof at trial. A defendant may demonstrate this in two ways: by showing that the plaintiff is unable to establish a *prima facie* case of discrimination; or, if the plaintiff has successfully established a *prima facie* case, by showing that the plaintiff could not produce sufficient evidence of pretext to rebut the defendant's articulated nondiscriminatory reasons for the discharge. *Jalil v. Avdel Corp.*, 873 F.2d 701, 707 (3d Cir.1989), *cert. denied*, 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990).

■ Defendants do not contest Stouch's ability to establish a *prima facie* case of age discrimination.[10] Instead they argue that he cannot produce sufficient evidence to rebut the articulated non-discriminatory reason for his discharge. Defendants claim that the reason for Stouch's discharge was that they were dissatisfied with the quality and variety of the food served under his direction. McGuire Aff.; McGuire Dep. at 88. The court finds that there is sufficient evidence to create a genuine issue of material fact as to whether this proffered reason is pretextual.

Stouch presents a letter, dated March 10, 1992, from Reverend John J. McKenzie which states, among other things:

I am writing to commend the talents and services of Warren William Stouch. I have known Mr. Stouch for about eleven years, since he first came to St. Thomas Monastery as an assistant chef. His performance quickly earned him appointment as Head Chef, a position he has held for about ten years.

. . . . .

The idiosyncratic needs of some, the dietary restrictions of others, and the varied schedules for this diverse community all serve to place considerable demands on the chef. Yet his indomitable spirit and friendly manner made each and all feel that their needs were important and were well addressed and served.

Special celebrations for Feasts, Holidays and a weekly cocktail party all served to bring Mr. Stouch's culinary creativity to special performance level. Each special occasion was concluded with a round of applause for Chef Stouch and his staff.

To have served the food needs for such a demanding and varied a public with style and sensitivity is a true achievement. To have done so with distinction for a decade is achievement of the very highest order.

Warren William Stouch will not disappoint the client that entrusts with him their fondest culinary expectations.

Exhibit "C" to Plaintiff's Memorandum in Opposition to Villanova's Motion for Summary Judgment.

The letter praising Stouch's performance as chef creates a genuine issue of material fact as to whether the proffered reason for his termination was the true reason. Thus, determination of the truthfulness of defendants' articulated non-discriminatory reason for Stouch's dismissal must be left to the jury. As the United States Supreme Court has recently explained:

The factfinder's disbelief of the reasons put forward by the defendant ... may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons, will permit the trier of fact to infer the ultimate fact of intentional discrimination, and ... upon such rejection, no additional proof of discrimination is required.

---

**10.** In order to establish a *prima facie* case, Stouch must show that he: (1) belongs to a protected class (i.e. is over forty years of age); (2) was qualified for the position; (3) was dismissed despite being qualified; and (4) ultimately was replaced by a person sufficiently younger

to permit an inference of age discrimination. *Sorba*, 821 F.2d at 202 (citing *Maxfield v. Sinclair International*, 766 F.2d 788, 793 (3d Cir. 1985), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986)).

*Hicks,* —— U.S. at ——, 113 S.Ct. at 2749 (internal quotation marks and emphasis omitted).

### 3. Application of ADEA and PHRA to defendants does not violate the first amendment's guarantees of freedom of religion

■ McGuire and the Brothers argue that Stouch's ADEA claim must be dismissed because to apply it in this situation would violate the first amendment's free exercise and establishment clauses. Similar arguments were advanced and rejected in *Lukaszewski v. Nazareth Hospital,* 764 F.Supp. 57 (E.D.Pa.1991).

As the court explained in *Lukaszewski,* 764 F.Supp. at 59–60, application of the ADEA or PHRA to defendants does not violate the First Amendment's establishment clause because there is little risk that adjudication of plaintiff's ADEA or PHRA claims will lead to excessive governmental entanglement in defendants' affairs or call into question their religious tenets. The primary trial issue in this case will be whether defendants terminated their relationship with Stouch because of his age or because they were dissatisfied with his job performance. Culinary demands, not church doctrine, will be subject to scrutiny.

Application of ADEA or PHRA to defendants does not violate the first amendment's free exercise clause, *see Lukaszewski,* 764 F.Supp. at 61, because they are neutral laws of general applicability to any employer and do not target or discriminate against religious organizations in any way. *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* —— U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472, 61 U.S.L.W. 4587 (1993); *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).[11]

### B. Intentional Infliction of Emotional Distress

■ Count III of the Complaint attempts to state claims for the tort of intentional infliction of emotional distress. As defined in the *Restatement:*

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and, if bodily harm to the other results from it, for such bodily harm.

*Restatement (Second) of Torts* § 46 (1965). The Pennsylvania Supreme Court has repeatedly applied the *Restatement* definition to claims for intentional infliction of emotional distress. *See, e.g., Kazatsky v. King David Memorial Park, Inc.,* 515 Pa. 183, 527 A.2d 988, 991–95 (1987); *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Co.,* 494 Pa. 501, 511 n. 8, 431 A.2d 966, 971–72 n. 8 (1981). However, the court has also repeatedly found that the facts presented did not constitute the tort. *See, e.g., Kazatsky* 527 A.2d at 995 (plaintiffs' recovery barred by their failure to present competent medical evidence of alleged emotional distress); *D'Ambrosio,* 431 A.2d at 971–72 n. 8 (defendant's behavior was not "extreme and

---

11. Defendants rely upon *DeMarco v. Holy Cross High School,* 797 F.Supp. 1142 (E.D.N.Y.1992) to support their argument that ADEA and PHRA should not be applied to them. In that case, DeMarco, a layman, brought an ADEA action against Holy Cross, a Catholic High School, after he was denied tenure and discharged from his math teaching position. Among the non-discriminatory reasons advanced by Holy Cross for DeMarco's termination were that he violated school policy when he failed to begin each class with a prayer and failed to attend Mass with his students. The district court held that the ADEA should not be construed to apply to parochial schools, at least with respect to employees with some religious duties, such as teachers required to lead students in prayer. *DeMarco,* 797 F.Supp. at 1151–52.

*DeMarco* is readily distinguishable from the instant case, since all of Stouch's duties at the Monastery were secular, and there is no claim that he was discharged for violating religious obligations. Further, subsequent to defendants' submission of their motion for summary judgment the *DeMarco* district court was reversed by the court of appeals for the second circuit. *DeMarco v. Holy Cross High School,* 4 F.3d 166 (2d Cir., 1993). The second circuit, in reasoning very similar to that in *Lukaszewski,* recognized that "[t]here may be cases involving lay employees in which the relationship between employee and employer is so pervasively religious that it is impossible to engage in an age-discrimination inquiry without serious risk of offending the Establishment Clause. This is not such a case." *DeMarco,* 4 F.3d at 172.

outrageous" as required by § 46); *but see, Papieves v. Lawrence,* 437 Pa. 373, 263 A.2d 118 (1970) (allowing recovery for serious emotional distress directly caused by the intentional and wanton acts of mishandling a decedent's body).

In *Kazatsky,* the Pennsylvania Supreme Court complained that "[v]arious other courts have incorrectly taken the view that this Court has adopted section 46," 527 A.2d at 988–89 n. 1 (citing *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265 (3d Cir. 1979); *Banyas v. Lower Bucks Hospital,* 293 Pa.Super. 122, 437 A.2d 1236 (1981)), and left "to another day the question of the viability of section 46 in this Commonwealth." *Kazatsky,* 527 A.2d at 989. At least one Pennsylvania Superior Court decision has concluded that "*Kazatsky* makes clear that the tort of intentional infliction of emotional distress is not recognized in Pennsylvania." *Ford v. Isdaner,* 374 Pa.Super. 40, 542 A.2d 137, 139 (1988), *app. denied,* 520 Pa. 617, 554 A.2d 509 (1988). However, the third circuit has confronted this question since *Kazatsky* was decided, and has repeatedly held that Pennsylvania does recognize the tort, in spite of "speculation" to the contrary raised by *Kazatsky.* *Silver v. Mendel,* 894 F.2d 598, 606 (3d Cir.1990), *cert. denied,* 496 U.S. 926, 110 S.Ct. 2620, 110 L.Ed.2d 641 (1990); *accord, Clark v. Falls,* 890 F.2d 611, 623 (3d Cir. 1989); *Williams v. Guzzardi,* 875 F.2d 46, 51 (3d Cir.1989). Accordingly, we find that the tort of intentional infliction of emotional distress, as defined by the *Restatement,* is recognized in Pennsylvania.

■ The *Restatement* definition has been broken down into four elements by the third circuit: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) the conduct must cause emotional distress; and (4) the distress must be severe. *Williams,* 875 F.2d at 52; *Chuy,* 595 F.2d at 1273. Defendants challenge plaintiff's ability to establish the first element of the claim.

■ The third circuit has recognized the "difficulty of providing a precise definition of 'outrageous' conduct." *Williams,* 875 F.2d at 51 n. 10. The *Restatement* describes the

type of conduct which is envisioned by § 46 to be "extreme and outrageous":

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Restatement (Second) of Torts* § 46, Comment d; *accord, Silver,* 894 F.2d at 606 n. 17; *Kazatsky,* 527 A.2d at 991.

Pennsylvania courts have been "chary to declare conduct 'outrageous,'" *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988); *Clark,* 890 F.2d at 623, and "have been cautious in permitting recovery for intentional infliction of severe emotional distress." *Williams,* 875 F.2d at 52; *accord, Silver,* 894 F.2d at 606. The complained of conduct must be "both extreme and very offensive to the moral values of society," *Silver,* 894 F.2d at 606, and recovery has been allowed "only in limited circumstances where the conduct has been clearly outrageous." *Cox v. Keystone Carbon,* 861 F.2d at 395 (citation omitted). *See, e.g., Chuy* (recovery allowed when team doctor told reporter that member of team suffered from fatal blood disorder though knowing it to be untrue); *Papieves,* (recovery allowed against hit and run driver who, without attempting to obtain medical assistance and without notifying police or parents, removed child's body from scene of accident and buried it in a field).

Viewed against this stringent standard, the defendants' conduct does not rise to the "extreme and outrageous" level necessary to support a claim of intentional infliction of emotional distress in Pennsylvania.

Stouch's deposition testimony shows the basis for his claim of intentional infliction of emotional distress:

Q: In your Complaint you made reference to suffering some kind of injury or emotional distress as a result of being let go by the Monastery. Can you tell me, please, what your complaints in that regard are?

A: Well, to work for ten years for an organization, to be fired with no notice for no reason, and to be refused a letter of reference with which to obtain new employment is the basis of my complaint.

Stouch Dep. at 34.

Assuming that Stouch's allegations are true, comparison of these allegations with prior cases shows that they do not state a claim for intentional infliction of emotional distress in Pennsylvania. In *Wells v. Thomas*, 569 F.Supp. 426, 433–34 (E.D.Pa.1983), without cause, the plaintiff was stripped of her position as Personnel Director after 13 years in that position and placed in a newly created position without responsibilities. Her private office was taken away, and she was forced to work in a "corral space." Her secretary was reassigned to someone who used to report to her, a line was removed from her telephone without consultation, and she was the only managerial level employee whose phone calls were left unanswered when she was away from her desk. Her supervisor twice unjustifiably gave her poor performance evaluations, she was denied a deserved annual salary increase, and she was finally terminated from her job. "This conduct, though intentional and perhaps highly inappropriate in view of plaintiff's long work history . . . , is not the type of extreme and outrageous conduct which Pennsylvania courts have recognized as giving rise to a cause of action." *Id.*, 569 F.Supp. at 433. *See also, Cox v. Keystone Carbon*, 861 F.2d 390 (3d Cir.1988) (discharging employee first day after he returned from triple bypass surgery not sufficiently outrageous), *cert. denied*, 498 U.S. 811, 111 S.Ct. 47, 112 L.Ed.2d 23 (1990); *Sherman v. Prudential–Bache Sec., Inc.*, 732 F.Supp. 541 (E.D.Pa.1989) (conduct of employer engaging in premeditated plan to force employee to resign not sufficiently outrageous to go to jury). Accordingly, Count III of the Complaint is dismissed.

## IV. DEFENDANT VILLANOVA

 Stouch alleges in his complaint that Villanova was one of his employers. Complaint ¶ 8. It is clear as a matter of law that Villanova was not Stouch's employer under the common-law agency test described above. Stouch has adduced no evidence that he or his corporation was paid by Villanova or that Villanova had any right to determine what work should be done or how it should be done. *Zippo*, 713 F.2d at 36. Indeed, he has adduced no evidence that Villanova had any say in his work whatsoever. Thus, the undisputed facts show as a matter of law that Villanova was not his employer.

Apparently recognizing that he was not an employee of Villanova under a straightforward application of the test articulated in *Darden* (or *Zippo*), Stouch seeks to hold Villanova liable under an alter-ego theory. *See* Complaint ¶ 27. Courts have allowed an ADEA plaintiff to recover against a parent corporation for the discriminatory treatment of its subsidiary. *See, e.g., Berkowitz v. Allied Stores of Penn–Ohio, Inc.*, 541 F.Supp. 1209 (E.D.Pa.1982). In *Berkowitz*, the district court found that there are three "accepted tests for parent corporation responsibility" under ADEA: (1) the "integrated enterprise" test; (2) the "alter ego" test; and the (3) "mere instrumentality" test. 541 F.Supp. at 1214. The district court found that there is "little substantive difference" between these three tests:

All are different expressions and means of conducting essentially the same inquiry. Under each test, the Court inquires as to the degree of interrelation between the parent corporation and the subsidiary concerning the conduct that is at issue in the litigation. Where the parent and subsidiary have acted jointly or where the subsidiary has acted as an extension of the parent, subject to its knowledge and involvement, the Court may disregard the parent's separate corporate existence.

*Berkowitz*, 541 F.Supp. at 1215.

In the instant case, there is no parent/subsidiary relationship between the Order and Villanova. Nevertheless, we will assume without deciding that Villanova could in principle be held vicariously liable under one of

the three tests described in *Berkowitz.*[12] Stouch has presented no evidence that the Brothers acted as an extension of Villanova or that Villanova acted jointly with the Brothers in deciding to terminate his employment. Indeed, he has submitted no evidence that Villanova even knew about the decision until after it had been made. Therefore, Villanova's motion for summary judgment must be granted as to Count I of the Complaint.

Having dismissed the only federal claim against Villanova, the pendent state law claims must also be dismissed. No "extraordinary circumstances" exist which would warrant this court's retention of jurisdiction over state claims in the absence of a viable federal claim. *Lovell Mfg. Div. of Patterson–Erie Corp. v. Export–Import Bank of United States,* 843 F.2d 725, 735 (3d Cir. 1988).

An appropriate Order follows.

### ORDER

AND NOW, this 27th day of September, 1993, upon consideration of defendants' motions for summary judgment and plaintiff's responses thereto, it is hereby ORDERED that:

1. Defendant Villanova University's motion for summary judgment is GRANTED, and judgement is entered in favor of Villanova University and against plaintiff.

2. The motions for summary judgment of defendants Brothers of the Order of Hermits of St. Augustine and Reverend William A. McGuire are GRANTED IN PART and DENIED IN PART as follows:

A. The motions are DENIED as to Counts I and II of the complaint.

B. The motions are GRANTED as to Count III of the Complaint.

---

12. We note, however, that the standard articulated by the *Berkowitz* court appears to be much easier for a plaintiff to meet than the test for alter-ego liability in Pennsylvania as articulated by the third circuit. Pennsylvania "does not allow recovery under an alter-ego theory unless the party seeking to pierce the corporate veil ... establishes that the controlling corporation wholly ignored the separate status of the controlled corporation and so dominated and controlled its affairs that its separate existence was a mere sham.... In other words, ... Pennsylvania ... require[s] a threshold showing that the con- trolled corporation acted robot- or puppet-like in mechanical response to the controller's tugs on its strings or pressure on its buttons." *Culbreth v. Amosa, Ltd.,* 898 F.2d 13, 14 (3d Cir.1990). Under this alter-ego standard, the plaintiff must present evidence sufficient "to support a determination that [the Monastery and Villanova] are to be treated as one and the same, ... that the corporations simply acted interchangeably and in disregard of their corporate separateness." *Publicker Industries, Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1070 (3d Cir.1979).